# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DYNALANTIC CORP., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 95-2301 (EGS) |
| | ) | |
| UNITED STATES DEP'T OF DEFENSE, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## BRIEF OF *AMICUS CURIAE* MOUNTAIN STATES LEGAL FOUNDATION IN SUPPORT OF DYNALANTIC CORP.

William Perry Pendley
J. Scott Detamore
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
303-292-2021
303-292-1980 (fax)
detamore@mountainstateslegal.com

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................2

I.  THE USE OF RACIAL CLASSIFICATIONS BY GOVERNMENT IS
PRESUMPTIVELY UNCONSTITUTIONAL, AND THEIR USE BY
GOVERNMENT MAY BE UPHELD ONLY UPON THE MOST
EXTRAORDINARY JUSTIFICATION........................................................................ 2

II.  THE ONLY JUSTIFICATION FOR RACIALLY DISCRIMINATORY
PREFERENCES IS TO ERADICATE A PARTICULARLY IDENTIFIED,
WIDESPREAD, SYSTEMATIC PATTERN OF INTRANSIGENT,
PURPOSEFUL, EXTREME DISCRIMINATORY CONDUCT. ................................... 3

  A.  THE GOVERNMENT'S BURDEN IS TO ESTABLISH THAT IT POSSESSED A STRONG
      BASIS IN EVIDENCE THAT SUCH INVIDIOUS DISCRIMINATION EXISTS AND THAT IT
      CAN BE REMEDIED ONLY BY RACIALLY DISCRIMINATORY PREFERENCES. ................... 4

  B.  THE GOVERNMENT MUST CLEARLY IDENTIFY WITH PARTICULARITY THE
      DISCRIMINATION, THE SCOPE OF THE INJURY IT CAUSED, AND THE EXTENT OF THE
      REMEDY NECESSARY TO CURE THE INJURY. ................................................................ 4

  C.  SOCIETAL DISCRIMINATION MAY NOT SERVE AS A JUSTIFICATION FOR THE USE OF
      RACIAL PREFERENCES. ................................................................................................ 5

  D.  STRONG EVIDENCE CONSISTS OF RELIABLE STATISTICS SUPPORTED BY
      VERIFIABLE ANECDOTAL EVIDENCE. ........................................................................... 6

    1.  Anecdotal evidence cannot justify racial preferences. ...................................... 6

    2.  Statistical evidence must establish a causal relationship between
        disparities and invidious discrimination by controlling for major non-racial
        explanatory variables. ...................................................................................... 6

III.  THE UNITED STATES HAS FAILED TO MEET ITS BURDEN HERE. ................... 8

  A.  THE PROGRAMS INTEND TO ELIMINATE BARRIERS TO BUSINESS FORMATION AND
      DEVELOPMENT RESULTING FROM SOCIETAL DISCRIMINATION. ................................. 8

  B.  TO SERVE AS A COMPELLING INTEREST, THE DISCRIMINATION MUST BE CAPABLE
      OF ELIMINATION THROUGH RACIAL PREFERENCES; SOCIETAL DISCRIMINATION IS
      INCAPABLE OF ELIMINATION THROUGH RACIAL PREFERENCES. ............................... 11

**1.** Discrimination that may serve as a compelling interest must be capable of identification with such clarity that a racial remedy, which is narrowly tailored to eliminate it, is clear. ........................................................................ 11

**2.** Congress has no greater power to address societal discrimination through racial preferences than a city. ................................................................................ 11

**3.** There are a host of reasons why societal discrimination is an amorphous concept incapable of remediation. ............................................................... 12

    a.   The source of societal discrimination is unknowable. .............................. 12

    b.   Societal discrimination defies identification. ............................................ 12

    c.   The impact of societal discrimination cannot be ascertained. ................. 13

    d.   Distinguishing the impact of societal discrimination and other causes of racial group differences is difficult, if not impossible. ........................ 13

    e.   It cannot be determined how societal discrimination impacts different groups of people, particularly immigrants. ............................................... 14

    f.   Societal discrimination will continue so long as our borders are open to immigration. ......................................................................................... 14

IV. RECENT SCHOLARSHIP DEMONSTRATES THAT ALL EUROPEAN AMERICANS ARE NOT PRIVILEGED; "WHITE AMERICA . . . IS AN ETHNIC FAIRY TALE." ................................................................................. 15

CONCLUSION ...................................................................................................................... 17

CERTIFICATE OF SERVICE ............................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995)................................................... passim

*Associated General Contractors of Ohio v. Drabik*, 214 F.3d 730 (6th Cir. 2000) .............. 3, 4, 7

*Builders Association of Greater Chicago v. County of Cook*, 256 F.3d 642, 644 (7th Cir. 2001). 4

*City of Richmond v. J.A. Croson Company*, 488 U.S. 469 (1989)........................................ passim

*Contractor's Association of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 893 F.Supp. 419 (E.D. Pa. 1995), *aff'd* 91 F.3d 586 (3rd Cir. 1996)..................................................... 4

*Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 91 F.3d 586 (3d Cir. 1991)........................................................................................................... 6

*Coral Construction Company v. King County*, 941 F.2d 910 (9th Cir. 1991)............................... 6

*Coward v. ADT Security Systems, Inc.*, 140 F.3d 271 (D.C. Cir. 1998)........................................ 7

*Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County, Florida*, 943 F.Supp. 1546 (S.D. Fla. 1996), *aff'd* 122 F.3d 895 (11th Cir. 1997) ................... 6

*Engineering Contractors of South Florida v. Metropolitan Dade County*, 122 F.3d 895 (11th Cir. 1997) ............................................................................................................... 4, 6, 7

*Fullilove v. Klutznick*, 448 U.S. 48 (1980), *reversed, Adarand 1995*, 515 U.S. 200 (1995)........ 15

*Hirabayashi v. United States*, 320 U.S. 81 (1943)....................................................................... 2

*Hunter v. Regents of the University of California*, 190 F.3d 1061 (9th Cir. 1999) ...................... 3

*Middleton v. City of Flint, Michigan*, 92 F.3d 396, 403 (6th Cir. 1996) ................................. 5, 6

*Monterey Mechanical Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997)............................................. 3

*O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420 (D.C. Cir. 1992) ...... 4, 5, 6, 7

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ................................ 2

*Rothe Development Corporation v. United Stated Department of Defense*, 262 F.3d 1306 (Fed. Cir. 2001)........................................................................................................... 6

*Wessman v. Gittens*, 160 F.3d 790 (1st Circuit 1998) ............................................................. 3, 7

*Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986) ............................................. 4, 5, 9

**Other Authorities**

Greeley, Andrew M., *Ethnicity, Denomination and Inequality* (Beverly Hills: Sage Publications), Series Number 90-029, 1976 ...................................................................... 16

Webb, James, *Born Fighting, How the Scots-Irish Shaped America*, (Broadway Books 2004) . 15, 16

**INTRODUCTION**

This nation has long honored the principle that all persons must be treated equally by the laws, policies, and actions of government.  This concept is embodied in the Equal Protection Clause of the Fourteenth Amendment and the Equal Protection Component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.  The most pernicious and insidious form of differential treatment by government is that based on race, and it is the rare circumstance when such discriminatory treatment may be justified.  This Court is asked to determine whether racially discriminatory procurement by the United States Department of Defense, pursuant to the racial preferences of Section 8a of the Small Business Act and Department of Defense regulations (the Programs), is justifiable under the Equal Protection Component of the Due Process Clause of the Fifth Amendment.

Stripped of clever locution, the United States justifies these racially discriminatory preferences by arguing:  (1)  societal discrimination, that is, private discrimination by individual European Americans against individual members of select groups of non-European Americans,[1] results in social and economic imbalances between these two racial groups;[2]  (2)  these social and economic imbalances result in all individual members of the select groups of non-European Americans lacking the prerequisites for success;[3]  (3) the lack of the prerequisites for success

---

[1] Persons tracing their ancestry to two European countries, Spain and Portugal, are not considered discriminators, but are the victims of discriminatory treatment by other European Americans.  Moreover, all European Americans are considered discriminators and required to shoulder the burden of racial preferences regardless of any European American group's social and economic status.  *See* Section IV, *infra*, for scholarship discrediting the assumption that European Americans are a monolithic group.

[2] The United States believes that statistical disparities between these select groups and European Americans in any area of human enterprise demonstrate discrimination.  There is no need to engage in regression analysis to control for major race-neutral explanatory variables because the variables are themselves discriminatory.

[3] The United States argues that all such prerequisites are racially discriminatory.

results in the entry into and participation in the business world for all members of the select groups of non-European Americans being barred by nationwide barriers;  (4)  these nationwide barriers result in justification for Congress to enact nationwide, race-based "remedies" until societal discrimination ends, which will be evident when there are no more social and economic imbalances between European Americans and the select groups of non-European Americans.

This is the political philosophy of egalitarianism, a concept upon which this nation was not founded.  While it may possess philosophical, political, or moral appeal for some, it is impermissible under the Constitution of the United States.  The standard for which the United States argues would allow Congress to legislate racially discriminatory treatment favoring select racial or ethnic groups, in all areas of human aspiration and endeavor, for so long as there exist social or economic imbalances between those groups and a group consisting of European Americans.  This precept is patently unconstitutional.

## ARGUMENT

**I.    THE USE OF RACIAL CLASSIFICATIONS BY GOVERNMENT IS PRESUMPTIVELY UNCONSTITUTIONAL, AND THEIR USE BY GOVERNMENT MAY BE UPHELD ONLY UPON THE MOST EXTRAORDINARY JUSTIFICATION.**

The concept of equal protection of the laws embodied in the Constitution is founded on the principle that "distinctions between citizens solely because of their [race or] ancestry are by their vary nature odious to a free people whose institutions are founded upon the doctrine of equality."  *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943).  Thus, "[a] racial classification, regardless of purported motivation, is presumptively invalid and may be upheld only upon an extraordinary justification."  *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979).  Therefore, the use of racial classifications by government are "subject to the most exacting judicial scrutiny [and] it is the government's burden to satisfy the demands

of the extraordinary justification." *Hunter v. Regents of the University of California*, 190 F.3d 1061, 1069 (9th Cir. 1999). Thus, courts must subject any racial classification to a "most searching [and "skeptical"] examination." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 223, 237 (1995) (*Adarand 1995*). *Accord Wessman v. Gittens*, 160 F.3d 790, 808 (1st Circuit 1998) (the government bears "a heavy burden of justification [for] their use," because "*Croson* . . . leaves no doubt that only solid evidence will justify allowing race-conscious actions."); *Associated General Contractors of Ohio v. Drabik*, 214 F.3d 730, 735 (6th Cir. 2000) ("[T]he state bears the burden of demonstrating a strong basis in evidence for its conclusion that remedial action is necessary."); *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 713 (9th Cir. 1997) ("The burden of justifying different treatment by ethnicity or sex is always on the government.").

Thus, when the racial classification appears on the face of the statute, as it does here in the presumption of disadvantage afforded certain racial and ethnic groups, the statute is presumptively unconstitutional. If the government chooses to defend the constitutionality of the statute, it bears an extraordinary burden of proof in demonstrating that the racially discriminatory statute is necessary to remedy a systematic and widespread pattern of invidious and intransigent discrimination. Failure to meet that burden by a preponderance of the evidence is fatal to the government's case. The United States did not meet that burden here with its egalitarian explanation for its racially discriminatory preferences.

## II.   THE ONLY JUSTIFICATION FOR RACIALLY DISCRIMINATORY PREFERENCES IS TO ERADICATE A PARTICULARLY IDENTIFIED, WIDESPREAD, SYSTEMATIC PATTERN OF INTRANSIGENT, PURPOSEFUL, EXTREME DISCRIMINATORY CONDUCT.

Governments may use racially discriminatory preferences only in remedying "extreme" cases of "systematic" patterns of deliberate racial discrimination to "break down patterns of deliberate exclusion," *City of Richmond v. J.A. Croson Company*, 488 U.S. 469, 509 (1989),

caused by "pervasive, systematic, and obstinate discriminatory conduct." *Associated General Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000). Even then, however, racial remedies may be used only as a matter of "last resort," *Contractor's Association of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 893 F.Supp. 419, 424 (E.D. Pa. 1995), *aff'd* 91 F.3d 586 (3rd Cir. 1996); *Croson*, 488 U.S. at 519 (Justice Kennedy concurring), because such remedies are "the strongest of medicines" "reserved for those severe cases that are highly resistant to conventional treatment." *Engineering Contractors of South Florida v. Metropolitan Dade County*, 122 F.3d 895, 927 (11th Cir. 1997). Racial preferences are appropriate only as "a remedy for intentional discrimination. . . ." *Builders Association of Greater Chicago v. County of Cook*, 256 F.3d 642, 644 (7th Cir. 2001). Thus, only extreme cases of pervasive, systematic and obstinate discriminatory treatment would justify such a drastic remedy.

**A.**   **THE GOVERNMENT'S BURDEN IS TO ESTABLISH THAT IT POSSESSED A STRONG BASIS IN EVIDENCE THAT SUCH INVIDIOUS DISCRIMINATION EXISTS AND THAT IT CAN BE REMEDIED ONLY BY RACIALLY DISCRIMINATORY PREFERENCES.**

Before racially discriminatory remedies may be enacted, government must have before it a "strong basis in evidence" that invidious discrimination exists and is sufficiently widespread and intransigent to require a racially discriminatory remedy. *Croson*, 488 U.S. at 509. *Accord Wygant v. Jackson Board of Education*, 476 U.S. 267, 277 (1986); *O'Donnell Construction Co. v. District of Columbia*, 963 F.2d 420, 424 (D.C. Cir. 1992).

**B.**   **THE GOVERNMENT MUST CLEARLY IDENTIFY WITH PARTICULARITY THE DISCRIMINATION, THE SCOPE OF THE INJURY IT CAUSED, AND THE EXTENT OF THE REMEDY NECESSARY TO CURE THE INJURY.**

Because "our history [of societal discrimination] will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate a 'piece of the action' for its members," *Croson*, 588 U.S. at 510-511, government must "identify" the invidious discrimination to be remedied "with some specificity before [it] may use

race-conscious relief" because "racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic." *Croson*, 488 U.S. 505. These findings must be sufficiently detailed to "define both the scope of the injury and the extent of the remedy necessary to cure its effects." *Id.* at 509. "Absent such findings, there is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *Id.* Thus, "unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification, the court should not uphold" a racially discriminatory statute because "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Adarand 1995*, 515 U.S. at 229.

### C.    SOCIETAL DISCRIMINATION MAY NOT SERVE AS A JUSTIFICATION FOR THE USE OF RACIAL PREFERENCES.

Societal discrimination is insufficiently particular in source, scope, nature, or impact to "define both the scope of the injury and the extent of the remedy necessary to cure its effects." Accordingly, the Supreme Court and the circuit courts have rejected it as a compelling interest. "[S]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Croson*, 488 U.S. at 497; *Wygant*, 476 U.S. at 498. "Societal discrimination is insufficient and over expansive [and] . . . could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future." *Middleton v. City of Flint, Michigan*, 92 F.3d 396, 403 (6th Cir. 1996); *Wygant*, 476 U.S. at 276; *Croson*, 488 U.S. at 497. "Relief for such an ill-defined wrong could extend until the percentage of public contracts awarded to [minority contractors] mirrored the percentage of minorities in the population as a whole." *Croson*, 488 U.S. at 498. "[S]ocietal discrimination [is] an inadequate basis  for . . . race-conscious measures." *O'Donnell*, 963 F.2d at 428. "[S]ocietal discrimination . . . ha[s]

little or no probative value in supporting enactment of a race-conscious measure." *Rothe Development Corporation v. United Stated Department of Defense*, 262 F.3d 1306, 1306 (Fed. Cir. 2001). "A 'strong basis in evidence' cannot rest on 'an amorphous claim of societal discrimination.'" *Engineering Contractors*, 122 F.3d at 907. "Race-based preferences cannot be justified by reference to past 'societal discrimination'. . . ." *Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 91 F.3d 586, 596 (3d Cir. 1991).

### D. STRONG EVIDENCE CONSISTS OF RELIABLE STATISTICS SUPPORTED BY VERIFIABLE ANECDOTAL EVIDENCE.

#### 1. Anecdotal evidence cannot justify racial preferences.

"Anecdotal evidence . . . rarely, if ever, can  . . . show a systemic pattern of discrimination." *O'Donnell Construction*, 963 F.3d at 427.  Indeed, uncorroborated anecdotal evidence is "fraught with heartfelt, but erroneous, interpretations of events and circumstances." *Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County, Florida*, 943 F.Supp. 1546, 1584 (S.D. Fla. 1996), *aff'd* 122 F.3d 895 (11th Cir. 1997). Therefore, "[A racially discriminatory preference] cannot stand without a proper statistical foundation." *Coral Construction Company v. King County*, 941 F.2d 910, 919 (9th Cir. 1991). Hence,  "[a]necdotal evidence is most useful as a supplement to strong statistical evidence." *O'Donnell Construction*, 963 F.3d at 427.

#### 2. Statistical evidence must establish a causal relationship between disparities and invidious discrimination by controlling for major non-racial explanatory variables.

"It is permissible to remedy *discrimination*[;] [i]t is not permissible to remedy a *disparity* . . ." *City of Flint, Michigan*, 92 F.3d at 406 (6th Cir. 1996) (emphasis in original).  "[E]vidence of mere statistical disparities has been firmly rejected as insufficient by the Supreme Court, particularly in a context such as contracting, where special qualifications are so important."

*Drabik*, 214 F.3d at 736.  The "idea that discrimination caused the low percentage is nothing more than a hypothesis [because] there are many other possible explanations" that have "not been tested." *O'Donnell Construction,* 963 F.2d at 426.  The "existence of numerical disparities does not lead to the conclusion that discrimination exists . . . because disparity indices do not account for the myriad factors that can legitimately result in disparities." *Engineering Contractors*, 943 F.Supp. at 1582 (S.D. Fla. 1996), *aff'd* 122 F.3d 895 (11th Cir. 1997). "Plausible hypotheses are not enough to satisfy strict scrutiny." *City of Philadelphia*, 586 F.3d at 598.  "If . . . statistics are to be at all probative of discrimination, they must link cause and effect variables in a manner which would permit such an inference," because "*Croson* reaffirmed . . . that we must staunchly resist any attempt to substitute speculation about correlation for evidence of causation." *Wessman*, 160 F.3d at 803.

Therefore, to draw an inference of discrimination from statistical disparities, all "major variables" must be accounted for.  *Bazemore v. Friday*, 478 U.S. 385, 400 (1986).  "Major factors that a regression analysis must include depend on the facts and theory of the particular case." *Coward v. ADT Security Systems, Inc.*, 140 F.3d 271, 274 (D.C. Cir. 1998).  Without controlling for all major variables, "[t]here may ... be some regressions so incomplete as to be inadmissible as irrelevant." *Bazemore*, 478 U.S. at 400, n. 10.  Indeed, the "numerous [non-remediable] explanations [for disparities]" may even "includ[e] past societal discrimination." *Croson*, 488 U.S. at 503.  Thus, statistical disparities "by themselves, do not eliminate the possibility that they are caused by . . . societal discrimination," which may not be remedied by government.  *Wessman*, 160 F.3d at 803.

III.     **THE UNITED STATES HAS FAILED TO MEET ITS BURDEN HERE.**

A.     **THE PROGRAMS INTEND TO ELIMINATE BARRIERS TO BUSINESS FORMATION AND DEVELOPMENT RESULTING FROM SOCIETAL DISCRIMINATION.**

The United States claims that the Programs do not seek to remedy societal discrimination. Rather, it argues that the Programs only seek to eliminate particularly identified, racially discriminatory barriers to free enterprise. A rose by any other name remains a rose, and so does "societal discrimination" when masquerading as a racially discriminatory "barrier."  The so-called racially discriminatory barriers are barriers only by virtue of societal discrimination, not by virtue of any particularly identifiable discrimination that defines both the scope of the discrimination and the extent of a remedy needed to eradicate it.

The United States argues that, so long as the vestiges of societal discrimination create barriers to success, there can be no equality of opportunity; therefore, the United States must eradicate social or economic imbalances between racial and ethnic groups.  What the United States seeks is not equality of opportunity, but equality of result in all areas of social, economic, and political life.  This becomes clear from an examination of the alleged purpose of the Programs.

The United States identifies the compelling interest justifying the Programs as "breaking down barriers to minority business development created by discrimination and its lingering effects."  United States' Opening Brief (U.S. Opening) at 27.  The United States maintains that Congress found that these barriers resulted from "past inequities stemming from racial prejudice" that have "adversely affected our present economic system," resulting in economic inequities between European Americans and select groups of non-European Americans.  *Id.* at 17.  The United States opines that the Programs constitute an "effort to redress the effects of discrimination on entrepreneurial endeavors," *id.* at 22, and to "eradicate discriminatory barriers

to business development."  *Id.* at 33.  The Programs are designed "to enable disadvantaged individuals to overcome racial discrimination in business development and [to provide] equal opportunity in whatever industry they choose to enter,"  U.S. Opposition Brief (U.S. Opposition) at 19, and thereby to "increase the level of business ownership by minorities."  U.S. Opening at 15-16.  The Programs are intended to remain in effect until such times that "all people will have the *same* economic opportunities."  *Id.* (emphasis added).

However, the concept of "past inequities stemming from racial prejudice," resulting in inequities in the economic system that make success more difficult for some members of some groups than for some members of other groups, is vague and ill-defined, is nothing other than societal discrimination, because past inequities are "ageless in [their] reach into the past, and timeless in [their] ability to affect the future."  *Wygant*, 476 U.S. at 276; *Croson*, 488 U.S. at 497. This is confirmed by analyzing the barriers to business formation and development that the Programs seek to eliminate.

According to the United States, the barriers that create inequities in the economic system of the United States for select groups of non-European Americans, consist of "lack of business experience and capital" (U.S. Opening at 17), "deficiencies in working capital," "bonding requirements," "inadequate track record[s]," "lack of awareness of bidding opportunities," "unfamiliarity with bidding procedures," *id.*, "limited capital resources," "lack of formal education," "[lack of] business knowledge and experience," "undeveloped support networks," "limited market potential," *id.* at 36, "bid shopping, " *id.* at 38, "closed business networks," *id*. at 39, the "old buddy network," *id*. at 47, and "lack of access to credit." *Id.* at 41.  To this list might be added, for example, such items as newer and smaller businesses, less equipment, larger debt

loads, inability to obtain supplier price reductions through volume buying, less collateral, less home ownership, fewer non-business assets, and many others.

Every person desiring to begin and develop any business is faced with these "barriers" regardless of race.  Indeed, in *Croson*, the Supreme Court held that these are race-neutral barriers to success.[4]  The United States claims that these barrier result from what *Croson* described as "the sorry history of both private and public discrimination in this country."  *Croson*, 488 U.S. at 499.  The United States overlooked, however, that *Croson* also held this history insufficient as a compelling interest because it "will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate a 'piece of the action' for its members," *id.* 488 U.S. at 510-511, leading to a "mosaic of shifting preferences based on inherently unmeasureable claims of past wrongs," where "[t]he dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost."  *Id.* at 506.

The United States argues that *Croson's* emphatic holding that America's "sorry history" may not serve as a compelling interest does not apply to the United States Congress because Congress is a national legislature, which may aim its remedy at the entire nation and at all entrepreneurial endeavor.[5]  But the United States confuses the scope of Congress' jurisdiction with the type and nature of the discrimination Congress may seek to eradicate through race-conscious legislation.  The requirement of identifiable, quantifiable discrimination that is sufficiently particularized to define both the discrimination and the scope of the remedy

---

[4] "[D]eficiencies in working capital, inability to meet bonding requirements, unfamiliarity with bidding procedures, and disability caused by an inadequate track record" were recognized as a few of a "host of non-racial factors that would seem to face a member any racial group."  *Croson*, 488 U.S. at 498-99.

[5] The United States effectively argues that the broader the brush with which it paints a racial remedy, the more likely that it is constitutional.

necessary to eradicate it does not differ depending on the geographical scope of a government's jurisdiction or the presence of discrimination therein.  *Adarand 1995*, 515 U.S. at 231-32 ("the Constitution imposes upon federal, state, and local governmental actors the *same* obligation to respect the personal right to equal protection of the laws.").

**B.     TO SERVE AS A COMPELLING INTEREST, THE DISCRIMINATION MUST BE CAPABLE OF ELIMINATION THROUGH RACIAL PREFERENCES; SOCIETAL DISCRIMINATION IS INCAPABLE OF ELIMINATION THROUGH RACIAL PREFERENCES.**

**1.     Discrimination that may serve as a compelling interest must be capable of identification with such clarity that a racial remedy, which is narrowly tailored to eliminate it, is clear.**

Compelling interest and narrow tailoring are "hand-in-glove" concepts; one depends on the other.  Only strong evidence of a widespread pattern of particularly identified, purposeful discrimination, so severe that only race-conscious relief can cure it, may serve as a compelling interest.  Moreover, that same strong evidence must demonstrate the scope of the narrowly tailored remedy necessary to eliminate the identified discrimination and its impact.  This remedy must bear the most exact connection to the identified discrimination.  It is axiomatic, therefore, that if a remedy that will eradicate the identified discrimination cannot be ascertained or described, that "discrimination" may not serve as a compelling interest.

**2.     Congress has no greater power to address societal discrimination through racial preferences than a city.**

Societal discrimination is incapable of elimination through racially discriminatory preferences and so cannot constitute a compelling interest, as the Supreme Court and the circuit courts have recognized.  So long as economic and social differences exist in our society, the impact of societal discrimination will continue to be felt and will create disproportionately difficult barriers to human aspirations for individuals who are socially or economically less well off than others.  It is hard to imagine any end in sight to social and economic differences between

groups of peoples because of the myriad factors the courts have recognized that have produced those differences.

Congress may not find such discrimination compelling any more than may any other jurisdiction in which its impacts are felt because Congress may no more craft a narrowly tailored remedy that will eradicate societal discrimination or its impacts in the nation than may cities. Societal discrimination and its impacts are "ageless in their reach into the past and endless in their ability to affect the future," and this is as true nationally as it is locally.  There is simply no authority for the proposition that Congress is exempt from this factual and constitutional truth.

       **3.**     **There are a host of reasons why societal discrimination is an amorphous concept incapable of remediation.**

While the courts have held societal discrimination insufficiently compelling to justify racial preferences, little has been written of what it consists.  Most courts recognize societal discrimination when they see it, but little effort has been made to define or objectify it.

       **a.   The source of societal discrimination is unknowable.**

Societal discrimination is an amorphous concept incapable of cure because its source cannot be identified readily.  Theoretically it is the result of actions by and beliefs of some members of an entire racial or ethnic group.  For purpose of the Programs, that group consists of European Americans.

       **b.   Societal discrimination defies identification.**

Societal discrimination is the result of behavior that has its source in the economy, political structure, culture, mores, beliefs, religion, customs and traditions.  It ranges from subtle, unconscious perceptions and stereotypes about other groups to outright racial hatred.  It differs in different parts of the country.  Moreover, these ill defined beliefs and cultures change over time and the behavior resulting therefrom also changes over time, perhaps not consistently across the

nation.  One cannot eliminate and change the beliefs, conscious and unconscious perceptions, and psychology of an entire culture with racially discriminatory preferences.  Indeed, it is quite likely that racially discriminatory remedies will serve to concretize discriminatory beliefs and to create such beliefs and perception where they did not exist before.  For example, such remedies may reinforce the belief that certain groups are inferior and require governmental assistance to succeed, reinforcing stereotypes; or many persons upon whom the burden of these remedies falls may feel themselves unfairly the victims of governmental racism, creating racial prejudice where none may have existed before.

> **c.  The impact of societal discrimination cannot be ascertained.**

The impact of the behavior of a group so broad-based and variable as European Americans, brought about by a host of beliefs, customs, and traditions of that diverse group, is impossible to ascertain because its beliefs are not all the same.  These beliefs impact all areas of life, not only economic and social, but such things as where one lives, how one lives, how one thinks and relates to the society, how healthy one is, how one perceives success and happiness, family, job and other elements of a culture.  One cannot design a remedy to eliminate such ill defined impacts of such ill defined and differing beliefs.  One cannot legislate equality of result, culture, beliefs, social standing, or economics.

> **d.  Distinguishing the impact of societal discrimination and other causes of racial group differences is difficult, if not impossible.**

Distinguishing disparities and imbalances between racial groups caused by societal discrimination from the myriad other factors that may dictate differences between racial and ethnic groups, is very difficult.  The persons upon whom this impact has been felt and the nature of that impact is difficult, if not impossible, to ascertain.

13

### e. It cannot be determined how societal discrimination impacts different groups of people, particularly immigrants.

It is also difficult to ascertain the degree to which societal discrimination impacts different groups of people, particularly immigrants.  Only American Indians began life in this country and experienced the displacement they have seen.  Only African Americans were brought here as slaves.  The experience of these two groups is unique.  All other groups willingly emigrated here, and trace their origins to different countries, with different languages and cultures.  Most came here with little more than their clothes, a few precious belongings, and high hopes.  This remains as true today as it did in the nineteenth century.

This country has had several waves of immigration from different countries.  Those persons brought with them different cultural attitudes, values, beliefs, and religions.  However, most were poor and sought a better life.  Inevitably, these immigrants faced a sense of superiority, cultural and economic, from those who reached America before them.  However, the degree to which present day inequities are attributable to discrimination, as opposed to inequities caused by language, religious, cultural, social and economic differences, and date of arrival in this country, is impossible to ascertain.

### f. Societal discrimination will continue so long as our borders are open to immigration.

A racial remedy aimed at social and economic inequities brought about by societal discrimination cannot eliminate the imbalances that exist.  Indeed, so long America continues to open its borders to immigrants, legal or illegal, this cycle will continue, because those immigrants are culturally different, speak different languages, and are generally poor.  They begin life in this country at a disadvantage, before any discrimination might be practiced against them.  There will always be disparities between Americans many generations removed from their

country of origin and newly arrived immigrants.  Moreover, as long as there is such immigration, discrimination may result from the economic, cultural, educational, and religious differences of these newer arrivals.  At what point that impact disappears, or is explainable by factors other than discrimination, is entirely incapable of calculation, and no remedy racially preferential remedy may be adopted that addresses it.

## IV.  RECENT SCHOLARSHIP DEMONSTRATES THAT ALL EUROPEAN AMERICANS ARE NOT PRIVILEGED; "WHITE AMERICA . . . IS AN ETHNIC FAIRY TALE."

Racial preferences, as now used by the federal government and as have been in place, in part since the Executive Orders of Presidents Johnson and Nixon, and in full since the Parren Amendment to the Public Works Employment Act of 1977 (upheld, *Fullilove v. Klutznick*, 448 U.S. 48 (1980), *reversed, Adarand 1995*, 515 U.S. 200 (1995), are based on two erroneous assumptions:  "[A]nyone who was not a White Anglo-Saxon Protestant [WASP] had grounds for complaint about his or her people's collective 'struggle.'  And anyone who was a WASP was by default a privileged, less-than-deserving whipping post."  Webb, James, *Born Fighting, How the Scots-Irish Shaped America*, pp. 321-322 (Broadway Books 2004).

Thus, because the historical journey of the Scots-Irish, for example, was "both unknown and irrelevant" to the lawmakers who adopted racial preferences, the Scots-Irish, lost twice.  "First, since the dominant forces in American society were by assumption the WASP hierarchy, to be white, Protestant, and of British heritage immediately lumped one in with the New England Brahmin elites....[6]  And second, [t]o be of Southern descent brought with it an immediate presumption of invidious discrimination and cruelty dating back to the slave system and the

---

[6] "In this perverted logic," it is as if all WASPS "had landed together on the same ship at Plymouth Rock and the smart ones had gone to Boston while the dumbest had somehow made their way to West Virginia."  Webb, *supra*. 322.

unequal, segregated society that followed it."  Webb, *supra.* 322-323.  The result of such willing

ignorance of "the vast distinctions among white Americans" made "a statistical straw man of

'white America'" and was used to justify racial preferences that were "nothing more than an

imaginary façade."  Webb, *supra* 323.  Indeed, "white America is so variegated that it is an

ethnic fairy tale."  *Id.*

Had law makers sought to give lie to the fairy tale, they could have done so.  In 1974, the

University of Chicago's National Opinion Research Center (NORC) published a groundbreaking

study that divided American whites into seventeen ethnic and religious groupings and then rated

them by education and family income.[7]  As to white Baptists, for example, it found that they had

10.7 years of education, that is, approximately the same level of Black Americans in 1970.

Webb concludes:

> This meant that, even prior to the major affirmative action programs, there was a
> greater variation within "white America" than there was between white America
> and black America.  And in terms of education and income, the whites at the
> bottom were in approximately the same situation as blacks.

Webb, *supra*. 324.

The use of racial preferences over the last thirty years has exacerbated this reality.

NORC's General Social Survey for the years 1980-2000 reveals that:

> [O]nly 18.4 percent of white Baptists born after World War II and 21.8 percent of
> Irish Protestants have obtained a college degree, compared to a national average
> 30.1 percent that includes all races, a Jewish average of 73.3 percent, and an
> average among those of Chinese and Indian descent of 61.9 percent.

Webb, *supra*. 325.

Webb concludes that these statistics demonstrate that, for example, "whites who migrated

from the South with little capital, and after the generations of educational deprivation that

---

[7] *Published in* Greeley, Andrew M., *Ethnicity, Denomination and Inequality* (Beverly Hills:
Sage Publications), Series Number 90-029, 1976.

followed the Civil War, often brought their cultural disadvantage with them." *Id*. Thus, "these members of our society can hardly be called advantaged in a way that justifies legal discrimination against them as interchangeable members of a supposedly monolithic white majority." *Id*.

## CONCLUSION

However the United States chooses to characterize the discrimination it addresses with the Programs here, it is unquestionably "societal discrimination." That Congress has jurisdiction over the nation does not entitle it to address this discrimination. Such discrimination cannot legally or practically constitute a justification for racial preferences because its source is unknown, it is incapable of identification, and its impact on disparities between groups cannot be ascertained. It is an amorphous conceptualization. It describes nothing and it describes everything.

Under the Programs here, the shortcomings and discriminatory behavior of some are ascribed to and shouldered by all European Americans who engage in business with the government. Such Programs, even when combined with all the other racial preference programs of government, cannot address the impact of what has occurred since the establishment of Jamestown Colony, and will continue to occur until such time as there is no more immigration into this country.

What the United States really seeks is an end to strict scrutiny when Congress acts. It asks this Court to trust Congress, to accept that Congress, by legislating since 1789, has acquired such a vast knowledge and experience that any action it takes is justified. Indeed, what the United States seeks is something less than rational basis scrutiny – just trust Congress; it knows best. It asks this Court to defer to congressional judgment. Under *Adarand 1995* and *Croson*, this Court may not do so!

This Court has no choice but to hold that the Programs here do not meet the test of the

U.S. Constitution, and to strike them down.

_____

William Perry Pendley
J. Scott Detamore
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
303-292-2021
303-292-1980 (fax)
detamore@mountainstateslegal.com

## CERTIFICATE OF SERVICE

I certify that this 20th day of January 2005, I served on Counsel of Record (1) a true and accurate paper copy of the foregoing BRIEF OF *AMICUS CURIAE* MOUNTAIN STATES LEGAL FOUNDATION IN SUPPORT OF DYNALANTIC CORP. by overnight Federal Express, pre-paid, and (2) a true and accurate PDF file of same by e-mail, to the addresses shown following:

Michael E. Rossman
Center for Individual Rights
1233 20th Street, N.W., Suite 300
Washington, D.C. 20036
Phone:  (202) 833-8400
e-mail:  casale@cir-usa.org

Brian J. Sonfield
U.S. Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Phone:  (202) 514-7143
e-mail:  brian.sonfeld@usdoj.gov

Daniel Franklin Van Horn
U.S. Attorney's Office
Judiciary Center Building
555 4th Street, N.W., Room 4112
Washington, D.C. 20530
Phone:  (202) 514-7168
e-mail:  daniel.vanhorn@usdoj.gov

I also certify that this 20th day of January 2005, I sent to the Clerk of the U.S. District Court for the District of Columbia:  (1) the original and one (1) true and accurate paper copy of the foregoing BRIEF OF *AMICUS CURIAE* MOUNTAIN STATES LEGAL FOUNDATION IN SUPPORT OF DYNALANTIC CORP. by overnight Federal Express, pre-paid, and (2) a true and accurate PDF file of same by e-mail to dcd_cmecf@dcd.uscourts.gov:

_____
J. Scott Detamore, Esq.

19