**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| DYNALANTIC CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 95-2301 (EGS) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF DEFENSE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OPINION**

Plaintiff, the DynaLantic Corporation ("DynaLantic"), is a small business that designs and manufactures aircraft, submarine, ship, and other simulators and training equipment.  Plaintiff has brought this suit against Defendants – the Department of Defense ("DoD"), the Department of the Navy ("the Navy"), and the Small Business Administration ("SBA") – to challenge the constitutionality of Section 8(a) of the Small Business Act (the "Section 8(a) program"), which permits the federal government to limit the issuance of certain contracts to socially and economically disadvantaged businesses.  DynaLantic claims the Section 8(a) program is unconstitutional both on its face and as applied by Defendants in DynaLantic's industry, the military simulation and training industry.  Plaintiff claims that DoD's use of the Section 8(a) program, which is reserved for "socially and economically disadvantaged individuals," 15 U.S.C.

§ 637(a)(4)(A), constitutes an illegal racial preference which violates its right to equal protection under the Due Process Clause of the Fifth Amendment to the Constitution, in addition to its rights under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Plaintiff also initially challenged DoD's separate statutory program, 10 U.S.C. § 2323 ("the DoD program"), which, among other things, imposed an independent obligation on the Agency to participate in Section 8(a); however, as explained herein, this challenge is moot because the DoD Program no longer exists.

The initial summary judgment briefing in this case, including the submissions of amici, was completed in 2005. However, as a result of subsequent events relating to the DoD Program, the Court has reopened the record twice since that time. First, after the DoD Program was reauthorized by Congress in 2006, the Court denied without prejudice the parties' cross-motions for summary judgment to enable the parties to supplement the record to include the evidence before Congress at the time of the reauthorization. The parties submitted supplemental briefing and evidence in 2007. The reauthorization was short-lived, however; in 2008, the Federal Circuit held that the 2006 reauthorization of the DoD Program was facially unconstitutional and enjoined its enforcement. *Rothe Dev. Corp. v. Dep't of Def.* ("*Rothe VII*"), 545 F.3d 1023 (Fed. Cir. 2008). After receiving

additional briefing on the impact of *Rothe VII* in 2009, the Court again re-opened the record to examine evidence considered by Congress regarding Section 8(a) subsequent to the reauthorization of the DoD Program in 2006.  The parties have submitted further supplemental briefing and evidence, and the Court is now in a position to reconsider the cross-motions.  After careful consideration of the cross-motions, the oppositions and replies thereto, the amicus briefs, supplemental briefing by the parties, the entire record, and the applicable law, the Court concludes that the Section 8(a) program is constitutional on its face. However, the Court further concludes that the SBA's and DoD's application of the program to issue contracts in the military simulation and training industry does not survive strict scrutiny, and therefore DynaLantic prevails on its as-applied challenge.  Accordingly, for the reasons set forth below, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's cross-motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

I.  **BACKGROUND**

    A.  **Statutory and Regulatory Framework**

        1.  **The Section 8(a) Program**

The Section 8(a) program is a business development program for small businesses owned by individuals who are both socially and economically disadvantaged.  *See* 15 U.S.C. § 637(a); 13

C.F.R. § 124.1.  Small businesses owned and controlled by such individuals may apply to the SBA and, if admitted into the program, are eligible to receive technological, financial, and practical assistance, as well as support through preferential awards of government contracts.  The parties agree that DoD presently participates in the Section 8(a) program.  *See* Defs.' Status Report and Mot. for Order Directing Supplemental Briefing at 2, Doc. No. 235; Pl.'s Opp'n to Mot. for Order to Meet and Confer  at 3-4, Doc. No. 236.

In order for a firm to participate in the Section 8(a) program, the SBA must certify that the firm is a small disadvantaged business ("SDB") under specific criteria.[1]  *See* 15 U.S.C. §§ 636(j)(11)(E) & (F); 13 C.F.R. § 124.101.  A business qualifies as "small" if it meets the standards set forth in 13 C.F.R. Part 121.  *See* 13 C.F.R. § 124.102; *see also* 15 U.S.C. § 632(a)(1)-(3).  A small business is "disadvantaged" if at least fifty one percent of the firm is unconditionally owned and controlled by one or more individuals who are both socially and economically disadvantaged.  *See* 15 U.S.C. § 637(a)(4)(A)-(B); 13 C.F.R. § 124.105.  "Socially disadvantaged" individuals are persons who have been "subjected to racial or ethnic prejudice or

---

[1]  A number of acronyms referring to minority-owned and/or disadvantaged firms are used throughout.  "MBE" means minority business enterprise, "WBE" means women's business enterprise, "DBE" means disadvantaged business enterprise.  "SDB" means small (socially and economically) disadvantaged business.

cultural bias within American society because of their identities as members of groups without regard to their individual qualities.  The social disadvantage must stem from circumstances beyond their control."  13 C.F.R. § 124.103(a); *see also* 15 U.S.C. § 637(a)(5).  "Economically disadvantaged" individuals are those socially disadvantaged individuals "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged."  13 C.F.R. § 124.104(a); *see also* 15 U.S.C. § 637(a)(6)(A).

Individuals who are members of certain racial and ethnic groups are presumptively socially disadvantaged.  13 C.F.R. § 124.103(b)(1);[2] *see also* 15 U.S.C. § 631(f)(1)(B)-(c) (finding

---

[2]  The regulation, 13 C.F.R. § 124.103(b)(1), lists five broad groups and thirty-seven subgroups:
> There is a rebuttable presumption that the following individuals are socially disadvantaged:  Black Americans; Hispanic Americans; Native Americans (Alaska Natives, Native Hawaiians, or enrolled members of a Federally or State-recognized Indian tribe); Asian Pacific Americans (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China (including Hong Kong), Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, the Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Fiji, Tonga, Kiribati, Tuvalu, or Nauru); Subcontinent Asian Americans (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands or Nepal).

that socially disadvantaged persons include "members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control," and that "such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities"). This presumption is rebuttable, however, and may be overcome by credible evidence to the contrary. *See* 13 C.F.R. § 124.103(b)(3). In addition, an individual who is not a member of one of the groups presumed to be socially disadvantaged may gain admission to the Section 8(a) program by establishing by a preponderance of the evidence that the individual is socially disadvantaged under the criteria set forth in 13 C.F.R. § 124.103(c).

Social disadvantage is defined in terms of "bias" and "prejudice" and not in terms of other types of "disadvantage." *See* 13 C.F.R. § 124.103(a). Accordingly, the statutory and regulatory definition of "social disadvantage" in 15 U.S.C. § 637(a)(6)(A) and 13 C.F.R. § 124.103(a) includes those who have been disadvantaged by racial or ethnic prejudice but not those who have been disadvantaged solely by, for example, below average educational opportunities.

All prospective program participants must show that they are economically disadvantaged. To qualify as economically

6

disadvantaged, an individual must have a net worth of less than $250,000 upon entering the program, excluding the individual's ownership in the applicant business and equity in the individual's primary personal residence. *See* 13 C.F.R. § 124.104(c)(2). In addition to personal net worth, the SBA examines the individual's income for the three years prior to the application and the fair market value of all assets, whether encumbered or not. *See* 13 C.F.R. § 124.104(c). The SBA also compares the financial condition of those claiming disadvantaged status to others in the same or similar line of business who are not socially and economically disadvantaged. *Id.; see also* 15 U.S.C. § 637(a)(6)(E).

The Section 8(a) program is one of a number of government-wide programs designed to encourage the issuance of procurement contracts to, *inter alia*, small businesses, service disabled veterans, socially and economically disadvantaged individuals, and women. *See* 15 U.S.C. § 644. Congress has established an "aspirational goal" for procurement from socially and economically disadvantaged individuals, which includes but is not limited to the Section 8(a) program, of five percent of procurement dollars government wide. *See id.* § 644(g)(1). It has not, however, established a numerical goal for procurement from the Section 8(a) program specifically. *See id.* Additionally, each federal agency establishes its own goals by

7

agreement between the agency head and the SBA.  *Id.*  DoD has
established a goal of awarding approximately two percent of prime
contract dollars through the Section 8(a) program.  Pl.'s Mem. of
P.& A. in Supp. of its Mot. for Summ. J. ("Pl.'s MSJ") at 70.[3]
None of the goals established by Congress or DoD are rigid
numerical quotas, and there is no penalty for failure to meet the
goals.

The Section 8(a) program does not mandate the use of set-
aside contracts, ever.  Rather, Section 8(a) allows the SBA,
"whenever it determines such action is necessary and
appropriate," to enter into contracts with other government
agencies and then subcontract with qualified program
participants.  15 U.S.C. § 637(a)(1).  As stated above, there are
no quotas for issuance of Section 8(a) contracts, and no
penalties for failing to award them.  Admission to the Section
8(a) program does not guarantee that a participant will receive
8(a) contracts.  13 C.F.R. § 124.501(c).

Section 8(a) contracts can be awarded on a "sole source"
basis (*i.e.*, reserved to one firm) or on a "competitive" basis
(*i.e.*, between two or more Section 8(a) firms).  13 C.F.R.
§ 124.501(b).  Sole source 8(a) awards generally are limited in

---

[3]  For ease of reference, the cross-motions for summary
judgement will be referred to as "MSJs" throughout.

value to $6.5 million or below for manufacturing contracts and $4 million for all other contracts.  *See* 13 C.F.R. § 124.506.

SBA regulations prescribe circumstances under which SBA will not accept a procurement for award as an 8(a) contract.  One such circumstance arises where SBA has made a written determination that acceptance of the procurement would have an adverse impact on other small businesses.  This adverse impact concept is designed to protect small businesses which are performing government contracts located outside the Section 8(a) program. 13 C.F.R. § 124.504(c).

Section 8(a) program participants are required to have a comprehensive business plan which SBA is required to review annually.  13 C.F.R. §§ 124.402, 124.403.  Participants are also required to submit an annual certification that they meet program eligibility requirements along with financial and other information to enable the SBA to verify their continued eligibility and monitor their performance and progress in business development.  13 C.F.R. §§ 124.112(b), 124.509(c), 124.601, 124.602; *see* 15 U.S.C. §§ 637(a)(4)(c), 637(a)(6)(B), 637(a)(12)(A), 637(a)(20).  Program participants are eligible to receive management and technical assistance provided through SBA's private sector service providers, including (i) counseling and training in the operation of small business and business development; (ii) assistance in developing comprehensive business

9

plans; and (iii) assistance obtaining equity and debt financing. 13 C.F.R. §§ 124.701-124.704; *see* 15 U.S.C. § 636(j)(13) & (14).

A firm may remain in the Section 8(a) program for a maximum of nine years, but only if it continues to meet all of the eligibility requirements throughout that period. *See* 13 C.F.R. § 124.2; 15 U.S.C. §§ 636(j)(10)(E), 636(j)(10)(H), 636(j)(15). In contrast, a participant must leave the Section 8(a) program early if (1) it has attained its business objectives as set forth in its business plan on file with the SBA, and (2) it has demonstrated the ability to compete in the marketplace without further assistance under the program. *See* 13 C.F.R. § 124.302(a)(1). A participant who fails to maintain eligibility will be terminated from the program. *See* 13 C.F.R. § 124.303(a)(2). In addition, a participant must leave the program if the net worth of any of the owners on whom its eligibility is based exceeds $750,000. *See* 13 C.F.R. §§ 124.104(c)(2), 124.302(a)(2).

An individual or firm may participate in the Section 8(a) program only once. After exiting the Section 8(a) program for any reason, a firm is no longer eligible to reapply, and any individual who has been counted toward the ownership requirement for that firm may never again be counted toward the ownership requirement for another firm. *See* 13 C.F.R. § 124.108(b); 15 U.S.C. § 636(j)(11)(B) & (c).

The Small Business Act requires the President to submit an annual report to Congress on both the performance of small businesses generally and of small businesses owned by socially and economically disadvantaged individuals in particular. The report must include a discussion of the current role of small businesses in the economy on an industry-by-industry basis and include recommendations for revising the Act. 15 U.S.C. § 631b. The SBA is also required to submit to Congress an annual assessment of the Section 8(a) program. 15 U.S.C. § 636(j)(16)(B).

### 2. Plaintiff's Business

DynaLantic, a small business as defined by the SBA, bids on, competes for, operates in, and performs contracts and subcontracts in the simulation and training industry. The simulation and training industry is composed of those organizations that develop, manufacture, and acquire equipment used to train personnel in any activity where there is a human-machine interface. Pl.'s MSJ at 4. Firms that manufacture simulation and training equipment and that operate in the simulation and training industry must have specialized skills, qualifications, and knowledge. *Id.*

Plaintiff designs, fabricates, tests, installs, and supports sophisticated, high technology training devices for the U.S. military, foreign military services, and other customers. Pl.'s

MSJ, Ex. A, Decl. of Jeffery Weinstock ¶ 6.  Since its inception,
over 68 percent of DynaLantic's total revenues have been
generated from prime contracts with the U.S. military, and all of
those contracts have derived from contracts for simulators,
related training equipment, and services.  *Id.* ¶ 5.  Plaintiff
typically bids on, or competes for, contracts and subcontracts of
up to $15 million, with most of those contracts and subcontracts
being under $5 million in value.  Pl.'s MSJ at 4.  Generally
speaking, Plaintiff's main competitors are not large businesses
but rather are other small businesses, including SDBs such as
Section 8(a) firms.  *Id.*  Plaintiff has never been a participant
in the Section 8(a) program and has never been certified as a
SDB.  *Id.* at 4-5.

**B.  Procedural History**

In 1995, the Navy determined it would award a contract for
the development of a UH-1N Aircrew Procedures Trainer ("APT"), a
mobile flight simulator for the "Huey" helicopter, exclusively
through the Section 8(a) program.  Plaintiff, which had
previously designed and manufactured flight simulators for the
military, claims it would have competed for this procurement but
for the fact that it was not a participant in the Section 8(a)
program.  Plaintiff filed an administrative protest with the
government's contracting officer, contesting the decision to
procure the contract through the Section 8(a) program.  After

Plaintiff's administrative claim and subsequent administrative appeal were denied, it filed suit in this Court, claiming that the Navy's decision to procure the APT contract through the Section 8(a) program was unconstitutional.  Plaintiff sought declaratory and injunctive relief.

On May 20, 1996, this Court issued a Memorandum Opinion and Order denying DynaLantic's motion for a preliminary injunction, concluding that it lacked standing to bring its action and had otherwise failed to establish a sufficient factual and legal basis for the issuance of a preliminary injunction.  *See DynaLantic Corp. v. Dep't of Def.*, 937 F. Supp. 1 (D.D.C. 1996). Subsequently, on August 9, 1996, this Court dismissed the case on standing grounds.  *See* Order, Aug. 9, 1996.

Plaintiff appealed from both the denial of its motion for preliminary injunction and the dismissal order.  The D.C. Circuit dismissed the appeal from the denial of the motion for preliminary injunction as moot in light of the dismissal of the entire action, but granted DynaLantic's motion to enjoin the APT procurement during the pendency of the appeal from the dismissal order.  *DynaLantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1018 (D.C. Cir. 1997).  A few weeks later, while briefing for that appeal was still underway, the Navy canceled the proposed solicitation for the APT procurement.

13

The D.C. Circuit held that DynaLantic had standing to challenge the constitutionality of the Section 8(a) program, because Plaintiff was unable to compete for DoD contracts that are reserved for Section 8(a) program participants. *DynaLantic Corp.*, 115 F.3d at 1014.  The Court of Appeals noted that DynaLantic had not challenged Section 8(a) on its face in its original or first amended complaint.  Nevertheless, the Court of Appeals permitted DynaLantic to amend its pleadings upon remand in order to raise a facial challenge to the Section 8(a) program.

> We allow [Dynalantic] to amend its pleadings to raise a general challenge to the 8(a) program as administered by the SBA and participated in by the Defense Department. . . . [A]s amended, the case is clearly not moot.  The government apparently intends to continue to award contracts under the 8(a) program, and DynaLantic's challenge to the program is not mooted merely because the challenge to one particular application of it may be.

*Id.* at 1015.

Following the remand to this Court, Plaintiff filed a second amended complaint (the operative complaint for this litigation), which challenges the constitutional validity of the Section 8(a) and DoD programs.  *See* Second Am. Compl. ¶¶ 1, 13.  In Count I, the sole count of its complaint, DynaLantic claims that the set-aside components of Section 8(a) and the DoD programs deprive DynaLantic from competing for federal procurements in the simulation and training industry on the basis of race, thereby "violat[ing] DynaLantic's rights under 42 U.S.C. §§ 1981 and 2000d and the equal protection component of the Due Process

14

Clause of the Fifth Amendment of the Constitution." *Id.* ¶ 23.
DynaLantic seeks an injunction and declaratory judgment
"prohibiting Defendants . . . from awarding any contract for
military simulators based on the race of the contractors," a
declaratory judgment that the "set-aside scheme" is
unconstitutional on its face and as applied to the "military
simulator and training equipment industry," costs and attorneys'
fees. *Id.* at 8-9 (Prayer for Relief).

After extensive discovery and a stay in the case, the
parties filed cross-motions for summary judgment, oppositions,
and replies. Following the filing of the parties' cross-motions,
the Court invited amici, who had first shared their views in the
case in 1995, to file additional submissions. The NAACP Legal
Defense & Education Fund, Inc., the Pacific Legal Foundation, the
Mountain States Legal Foundation, and Rothe Development
Corporation filed amicus briefs.

On August 23, 2007, this Court issued a Memorandum Opinion
and Order denying the parties' cross-motions for summary judgment
without prejudice. The Court noted that DynaLantic challenged
not only the Section 8(a) program, but also DoD's policy of
awarding contracts to socially and economically disadvantaged
businesses pursuant to the DoD Program, 10 U.S.C. § 2323. The
Court also noted that the DoD Program had been reauthorized in
2006, but the record contained no information on the evidence

15

before Congress regarding that reauthorization.  The Court found, therefore, that it could not resolve the fundamental issues raised by the parties' motions without considering the evidence before Congress in 2006.  Accordingly, the Court ordered the parties to file supplemental briefs on the effect of the reauthorization of 10 U.S.C. § 2323.  In November 2007, the parties filed supplemental briefs and replies on the impact of the 2006 reauthorization of the Section 8(a) and the DoD programs on this case.  The parties also supplemented the record with legislative materials before Congress during the 2006 reauthorization.

In November 2008, the Federal Circuit held that Congress did not have a strong basis in evidence for implementing race-conscious measures when it reauthorized the DoD Program in 2006; thus, the Federal Circuit invalidated the DoD Program as facially unconstitutional.  *Rothe VII*, 545 F.3d 1023.  The parties in this case agreed that *Rothe VII* did not moot this case in its entirety "because DoD continues to participate in [the 8(a)] program under the statutory authority of the Small Business Act, independent of [the DoD Program].  Therefore, this case continues to present a live controversy about DoD's use of the Section 8(a) program." Defs.' Status Report at 2, Doc. No. 235; *see also* Pl.'s Opp'n to Defs.' Mot. for Order to Meet and Confer at 3-4, Doc. No. 236. Defendants requested that the record be supplemented to include

additional information that Congress had amassed since the 2006 reauthorization.  Defendants argued "that the Court should consider" the more recent evidence "in connection with the compelling interest underlying the Section 8(a) program and the continuing need for that program's race-conscious features." Defs.' Status Report at 2, Doc. 235.  The Court agreed, and on October 23, 2009, ordered that "the record in this action shall be supplemented to include pertinent materials considered by Congress subsequent to the reauthorization" of the DoD Program. Minute Order, Oct. 23, 2009.  The parties submitted a joint report containing a proposed list of additional Congressional materials to be considered, and thereafter submitted supplemental briefing addressing the effect of those additional Congressional materials on the issues in this case.  The cross-motions for summary judgment, as supplemented by the additional record evidence and additional briefing, are now ripe for resolution by the Court.

## II.  STANDARD OF REVIEW AND BURDEN OF PROOF

### A.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986);

*Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217, 224 (D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

**B.  Permanent Injunction & Declaratory Judgment**

Plaintiff seeks a permanent injunction preventing Defendants from using Section 8(a) to award contracts, both generally and in the simulation industry.  The standard for granting a permanent injunction is much like the standard for a preliminary injunction, and the Court is required to consider four factors: (1) success on the merits; (2) whether the movant will suffer irreparable injury absent an injunction; (3) the balance of hardships between the parties; and (4) whether the public interest supports granting the requested injunction.  *Winter v. Natural Res. Def. Council,* Inc., 555 U.S. 7, 32 (2008) (citations omitted). Unlike a preliminary injunction, actual success on the merits is a prerequisite to obtain permanent injunctive relief. *Id.*

In addition to injunctive relief, Plaintiff also requests a declaratory judgment.  *See* 28 U.S.C. § 2201(a) ("In a case of

actual controversy within its jurisdiction, . . . any court of
the United States . . . may declare the rights and other legal
relations of any interested party seeking such declaration,
whether or not further relief is or could be sought."); Fed. R.
Civ. P. 57.

### C.    Facial Challenge

The parties dispute the correct standard for a facial
challenge.  Defendants argue that this Court must apply the test
articulated by the Supreme Court in *United States v. Salerno*,
that "[a] facial challenge to a legislative Act is, of course,
the most difficult challenge to mount successfully, since the
challenger must establish that no set of circumstances exists
under which the Act would be valid."  481 U.S. 739, 745 (1987).
Plaintiff responds that the *Salerno* test was questioned as
possibly dictum by a plurality in *City of Chicago v. Morales*, 527
U.S. 41, 55 n.22 (1999) (plurality op., Stevens, J.) and urges
the Court not to apply it.  DynaLantic also relies on *Rothe VII*,
a case which bears directly on the history of this case because
it found the DoD Program's race-based measures unconstitutional.
In *Rothe VII*, the Federal Circuit followed its own circuit
precedent and declined to apply *Salerno* to a facial challenge to
the DoD Program's race-conscious measures.  545 F.3d at 1032.
Plaintiff urges this Court to do the same.

19

Plaintiff fails to recognize, however, that the *Salerno* test has been adopted by this Circuit and cited with approval following *Morales*. Although the Circuit acknowledged the views expressed by Justice Stevens, it expressly stated that, "[f]or our part, we have invoked *Salerno*'s no-set-of-circumstances test to reject facial constitutional challenges." *AmFac Resorts v. Dep't of Interior*, 282 F.3d 818, 826 (D.C. Cir. 2002) (citing authorities), *vacated in part on other grounds sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003); *see also Shelby County v. Holder*, 679 F.3d 848, 883 (D.C. Cir. 2012).[4] This Court is bound by Circuit precedent; accordingly, the *Salerno* test applies.

**D. Strict Scrutiny**

The parties agree that Section 8(a) employs a race-based rebuttable presumption to define the class of "socially disadvantaged" individuals who may, if they also establish economic disadvantage, participate in the program. The parties further agree that Section 8(a) authorizes the use of race-conscious remedial measures. Accordingly, to the extent that the Section 8(a) program relies on race-conscious criteria, it is

---

[4] As Plaintiff points out, the Federal Circuit has questioned the applicability of *Salerno* to equal protection cases. Pl.'s MSJ at 43-44. At least two other circuits, however, have applied *Salerno* to equal protection challenges. *See W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005); *Sherbrooke Turf v. Minn. Dep't of Transp.*, 345 F.3d 964, 971 (8th Cir. 2003).

subject to strict scrutiny.  "[R]acial classifications . . . are constitutional only if they are narrowly tailored measures that further compelling governmental interests."  *Adarand Constructors, Inc. v. Peña* ("*Adarand III*"), 515 U.S. 200, 227 (1995); *accord City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion); *Winter Park Commc'ns, Inc. v. FCC*, 873 F.2d 347, 357 (D.C. Cir. 1989).

Although the test for strict scrutiny is rigorous, the Supreme Court has cautioned that it should not be interpreted as "strict in theory, but fatal in fact."  *Adarand III*, 515 U.S. at 237 (internal citation omitted).  "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it."  *Id.*

## III.  DISCUSSION

### A.  Legal Standard to Establish a Compelling Interest

The government must make two showings to articulate a compelling interest served by the legislative enactment.  First, the government must "articulate a legislative goal that is properly considered a compelling government interest."  *Sherbrooke*, 345 F.3d at 969.  The Supreme Court has held that the government has a compelling interest in "remedying the effects of past or present racial discrimination[.]"  *Shaw v. Hunt*, 517 U.S.

899, 909 (1996).   Second, "[i]n addition to identifying a
compelling government interest, the government must demonstrate
'a strong basis in evidence' supporting its conclusion that race-
based remedial action was necessary to further that interest."
*Sherbrooke*, 345 F.3d at 969 (quoting *Croson*, 488 U.S. at 500).
Strict scrutiny demands such review because:

> Absent searching judicial inquiry into the justification for
> race-based measures, there is simply no way of determining
> what classifications are . . . in fact motivated by
> illegitimate notions of racial inferiority or simple racial
> politics. Indeed, the purpose of strict scrutiny is to
> "smoke out" illegitimate uses of race by assuring that the
> legislative body is pursuing a goal important enough to
> warrant the use of a highly suspect tool.

*Croson*, 488 U.S. at 493.

The government can meet its burden without conclusively
proving the existence of racial discrimination in the past or
present.  *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 292
(1986) (O'Connor, J., concurring); *Concrete Works of Colo., Inc.
v. City and Cnty. of Denver* ("*Concrete Works IV*"), 321 F.3d 950,
958 (10th Cir. 2003).   The government may rely on both
statistical and anecdotal evidence, although anecdotal evidence
alone cannot establish a strong basis in evidence for the
purposes of strict scrutiny.  *Id.* at 977.   In order to determine
whether the government has demonstrated a strong basis in
evidence, the court must make "factual determinations about the
accuracy and validity of [the government's] evidentiary showing
for its program."  *Concrete Works of Colo., Inc. v. City and*

*Cnty. of Denver* ("*Concrete Works II*"), 36 F.3d 1513, 1522 (10th Cir. 1994).

After the government makes an initial showing, the burden shifts to DynaLantic to present "credible, particularized evidence" to rebut the government's "initial showing of a compelling interest." *Concrete Works IV*, 321 F.3d at 959 (citations omitted). "Notwithstanding the initial burden of initial production that rests with the [government], '[t]he ultimate burden of proof remains with [the challenging party] to demonstrate the unconstitutionality of an affirmative-action program.'" *Concrete Works* IV, 36 F.3d at 1522 (quoting *Wygant*, 476 U.S. at 277-78). Furthermore, although Congress is entitled to no deference in its ultimate conclusion that race-conscious action is warranted, its fact-finding process is generally entitled to a presumption of regularity and deferential review. *Rothe Dev. Corp. v. U.S. Dep't of Def.* ("*Rothe III*"), 262 F.3d 1306, 1321 n.14 (Fed. Cir. 2001) ("That Congress is entitled to no deference in its ultimate conclusion that race-based relief is necessary does not mean that Congress is entitled to no deference in its factfinding." (citing *Croson*, 488 U.S. at 500)); *cf. Am. Fed'n of Gov't Employees v. United States*, 330 F.3d 513, 522 (D.C. Cir. 2003) ("Incident to its lawmaking authority, Congress has the authority to decide whether to conduct investigations and hold hearings to gather information.").

**B.  The Purpose of Section 8(a)**

As set forth above, in order to meet the first prong of the compelling interest test, the government must identify a purpose for the use of race-conscious criteria that is properly identified as a compelling interest.  In this case, the government has identified the compelling interest for the Section 8(a) program as "breaking down barriers to minority business development created by discrimination and its lingering effects," including exclusion from contracting with the federal government.  Defs.' Mem. of P.& A. in Supp. of Defs.' Mot. For Summ. J. ("Defs.' MSJ") at 27, 29.  DynaLantic argues that the government cannot identify a compelling interest unless it can show race discrimination in contracting by federal, state or local governments, or at the very least, that private industries directly used federal funds to discriminate.  Pl.'s MSJ at 33-37.  DynaLantic also argues that the race-based presumption of social disadvantage shows that the law's purpose was not remedial, but was instead "to favor virtually all minority groups, in general, over the larger pool of citizens (including those with lower economic opportunity)."  *Id.* at 40.

The Court rejects DynaLantic's argument that Defendants may only seek to remedy discrimination by a governmental entity, or discrimination by private individuals directly using government funds to discriminate.  It is well established that "[t]he

24

federal government has a compelling interest in ensuring that its funding is not distributed in a manner that perpetuates the effect of either public or private discrimination" within an industry in which it provides funding. *Western States*, 407 F.3d at 991 ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax dollars of all citizens, do not serve to finance the evils of private prejudice." (quoting *Croson*, 488 U.S. at 492 (plurality op. of O'Connor, J.))). As the Tenth Circuit has explained, such private prejudice may take the form of discriminatory barriers to the formation of qualified minority businesses, "precluding from the outset competition for public . . . contracts by minority enterprises." *Adarand VII*, 228 F.3d at 1167-68. Private prejudice may also take the form of "discriminatory barriers" to "fair competition between minority and non-minority enterprises . . . precluding existing minority firms from effectively competing for public construction contracts." *Id.* at 1168. In both cases, these barriers would "show a strong link between racial disparities in the federal government's disbursement of public funds" for federal contracts "and the channeling of those funds due to private discrimination." *Id.* at 1167-68. Accordingly, under the Fourteenth Amendment the government may implement race-conscious programs not only for the purpose of correcting its own

25

discrimination, but also "to prevent itself from acting as a 'passive participant'" in private discrimination in the relevant industries or markets.  *Concrete Works IV*, 321 F.3d at 958 (quoting *Croson*, 488 U.S. at 492).   The Court concludes, therefore, that the Defendants state a compelling purpose in seeking to remediate either public discrimination or private discrimination in which the government has been a "passive participant."  *Croson* 488 U.S. at 492.[5]

The Court also rejects DynaLantic's claim that Section 8(a)'s purpose is not truly remedial, but instead is "to favor virtually all minority groups, in general, over the larger pool of citizens (including those with lower economic opportunity)."  Pl.'s MSJ at 40.  As the government points out, the Section 8(a) program is designed "to identify individual businesses that are [economically] disadvantaged" by requiring an individualized showing of economic disadvantage by each successful applicant.  Defs.' Opp'n to Pl.'s MSJ ("Defs.' Opp'n") at 13.  The statute, in turn, defines "economically disadvantaged individuals" as socially disadvantaged individuals "whose ability to compete in the free enterprise system has been impaired due to diminished

---

[5] This section of the Memorandum Opinion only addresses whether "passive participation" in private discrimination is an appropriate purpose for race-based legislation.  It does not address whether the government has presented strong evidence of its passive participation in private discrimination.  *See infra* Section III.D.

capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged."  13 C.F.R. § 124.104(a); *see also* 15 U.S.C. § 637(a)(6)(A).  Individuals whose net worth exceeds $250,000 cannot establish economic disadvantage for purposes of entering the Section 8(a) program.  13 C.F.R. § 124.104(c)(2).  Moreover, the 8(a) program is open to socially and economically disadvantaged non-minority individuals.  *Id.* § 124.103(c).  In short, the program is directed at individual firms that can show economic disadvantage, and is not limited to minorities.  The Court agrees with the government that the Section 8(a) program's structure convincingly confirms its remedial purpose.  Defs.' Opp'n at 14.

   **C.   Evidence Before Congress**[6]

        **1.    Legislative History of the Section 8(a)
              Program**

     The Small Business Act of 1953 created the Small Business Administration ("SBA").  *See* Pub. L. No. 83-163, 67 Stat. 232 (1953).  Section 8(a) of the Act delegates to the SBA the authority and an obligation, "whenever it determines such action

---

        [6] This section draws, in substantial part, from the Defendants' submissions to the Court, which the Plaintiff, with few exceptions, does not challenge as a matter of historical record.  Of course, Plaintiff challenges the sufficiency of the evidence before Congress to demonstrate compelling interest, but the sufficiency of the evidence is not at issue in this section of the Court's Memorandum Opinion.

is necessary," to enter into contracts with any procurement
agency of the federal government to furnish goods and services.
*Id.* at § 8(a).  The SBA can also enter into subcontracts with
small businesses for the performance of such contracts.  The
Section 8(a) authority was dormant for a decade after the Small
Business Act was enacted.  The Section 8(a) program as it
operates today evolved from Executive Orders issued by Presidents
Lyndon B. Johnson and Richard M. Nixon in response to the Kerner
Commission.[7]  The Kerner Commission investigated incidents of
civil disorder in the inner cities following urban unrest in
1967.  Having found that disadvantaged individuals enjoyed no
appreciable ownership of small businesses and did not share in
the community redevelopment process, the Kerner Commission
recommended that steps be taken to increase the level of business
ownership by minorities so that they would have a better
opportunity to materially share in the competitive free
enterprise system.  *See* H.R. Rep. No. 956, at 2 (1982); S. Rep.
No. 1070, at 14 (1978).

Following the Kerner Commission's report, President Johnson
ordered the SBA to use its Section 8(a) authority to direct
contracts to businesses located in distressed urban communities
in order to create jobs.  Later, in 1969, pursuant to President

---

[7]  *See* Exec. Order No. 11375, 3 C.F.R. 684 (1966-1970);
Exec. Order No. 11518, 3 C.F.R. 907 (1966-1970).

Nixon's order, the SBA changed the emphasis of the Section 8(a)
program from hiring the unemployed in the inner city to
developing successful small businesses owned by disadvantaged
persons.  As a result of the Executive Orders, the SBA's Section
8(a) authority was used, by administrative regulation, to channel
federal purchase requirements to socially or economically
disadvantaged individuals.

Prior to the enactment of Pub. L. No. 95-507 in 1978,
Congress did not exert any legislative control over the Section
8(a) program other than indirectly through appropriations.  *See*
S. Rep. 29, at 4 (1987); H.R. Rep. No. 460, at 19 (1987); H.R.
Rep. No. 956, at 2 (1982); H.R. Rep. No. 949, at 3 (1978).  In
1972, however, the House Select Committee on Small Business
issued a report that included a lengthy description of the
problems confronting minority entrepreneurs.  The report
recognized that although minority and non-minority small business
owners had much in common, racial and ethnic prejudice posed a
"unique dilemma" for minority business owners which "presented
almost insurmountable obstacles to business development."  *See*
H.R. Rep. No. 1615, at 18-19 (1972).  The specific problems cited
in the report included lack of business experience and capital.
In addition, the report cited census statistics showing that
minorities comprised about 17 percent of the total U.S.
population but owned about 4.3 percent of United States

businesses, and that the receipts of those minority-owned businesses amounted to 0.7 percent of the total receipts reported for all firms. *Id*.

Similar statistical disparities were cited in a 1975 report on hearings conducted by the Subcommittee on Small Business Administration Oversight and Minority Enterprise of the House Committee on Small Business (the "1975 Report"). The report stated that minorities comprised about 16 percent of the nation's population while 3 percent of businesses were minority-owned, and those businesses realized about 0.65 percent of the gross receipts of all businesses in the country. The Subcommittee found that:

> [T]he effects of past inequities stemming from racial prejudice have not remained in the past. The Congress has recognized the reality that past discriminatory practices have, to some degree, adversely affected our present economic system. . . . These statistics are not the result of random chance. The presumption must be made that past discriminatory systems have resulted in present economic inequities. In order to right this situation the Congress has formulated certain remedial programs designed to uplift those socially or economically disadvantaged persons to a level where they may effectively participate in the business mainstream of our economy.

H.R. Rep. No. 468, at 1-2 (1975). The Subcommittee specifically expressed its "hope[] that some day remedial programs will be unnecessary and that all people will have the same economic opportunities," but concluded that, "until that time remedial action must be considered as a necessary and proper accommodation

for our Nation's socially or economically disadvantaged persons."
*Id.* (footnote omitted).

The Subcommittee that prepared the 1975 Report took "full
notice as evidence for its consideration" of reports submitted to
Congress by the General Accounting Office ("GAO") and by the U.S.
Commission on Civil Rights.  *Id.* at 11.  The latter report, based
on statistical data compilation as well as interviews and other
qualitative data gathered from a broad swath of federal and state
government agencies, discussed the barriers encountered by
minority businesses in gaining access to government contracting
opportunities at the federal, state, and local levels.  Among the
major difficulties confronting minority businesses were
deficiencies in working capital, inability to meet bonding
requirements, disabilities caused by an inadequate "track
record," lack of awareness of bidding opportunities,
unfamiliarity with bidding procedures, preselection before the
formal advertising process, and the exercise of discretion by
government procurement officers to disfavor minority-owned
businesses.  *See* U.S. Comm'n on Civil Rights, Minorities and
Women as Government Contractors, at 16-28, 86-88 (1975) ("CCR
Report").  More specifically, the CCR Report stated:

> Minority and female-owned firms . . . received less than
> seven-tenths of one percent of the contracting dollars of
> state and local governments which were able to provide data
> to the Commission.  Unlike federal procurement, a
> substantial portion of State and local purchases is for
> items bought in relatively small quantities from wholesalers

> and retailers.  State and local governments also spend
> proportionately more than the Federal Government for
> construction.  Since a large percentage of minority firms
> are retail and small construction companies . . .  both the
> volume and nature of State and local contracting should
> provide extensive contracting opportunities for minority
> [firms].

CCR Report at 122.  However, the percentage of contracting

dollars awarded to women and minority firms at the state and

local level - less than seven tenths of one percent - did not

reflect these "extensive contracting opportunities." *Id.*  The

CCR Report found one reason for the disparity was discrimination.

> The unwillingness of many contracting officers [in state and
> local governments] to abandon long-established practices not
> directed toward minorities or women is an obstacle to
> effective implementation of special contracting programs.
> Efforts to increase the number of minority and female-owned
> firms on bidders' lists have been thwarted by contracting
> practices, such as requiring minority and female-owned firms
> to comply with stringent pre-qualification standards.
>
> [T]he Commission found . . . negative and even hostile
> attitudes among State and local procurement officers toward
> minority and female firms.

*Id.* at 125, 127.

In 1977, the House Committee on Small Business issued a

report (the "1977 Report") summarizing its activities during the

preceding two years, one chapter of which summarized the 1975

Report.  *See* H.R. Rep. No. 1791, at 124-49 (1977).  Another

chapter of the 1977 Report summarized a review of the SBA's

Surety Bond Guarantee Program, as a result of which the following

finding was made:

> The very basic problem disclosed by the testimony is
> that, over the years, there has developed a business
> system which has traditionally excluded measurable
> minority participation.  In the past more than the
> present, this system of conducting business
> transactions overtly precluded minority input.
> Currently, we more often encounter a business system
> which is racially neutral on its face, but because of
> past overt social and economic discrimination is
> presently operating, in effect, to perpetuate these
> past inequities.

*Id.* at 182.

Congress codified the Section 8(a) program in 1978.  *See*

Pub. L. No. 95-507, 92 Stat. 1760 (1978).  Reports prepared by

the GAO and investigations conducted by both the executive and

legislative branches prior to the 1978 codification showed that

the Section 8(a) program had fallen far short of its goal to

develop businesses owned by disadvantaged individuals, and that

one reason for this failure was that the program had no

legislative basis.  *See* S. Rep. No. 1070, at 14 (1978) (the "1978

Report").  The 1978 Report explained that the bill's purpose was

to provide a statutory basis for the program and establish the

policy goal of developing businesses owned by socially and

economically disadvantaged persons, "rather than the mere

awarding of 8(a) contracts."  *Id.* at 2-3, 14.  The 1978 report

also recognized that "the pattern of social and economic

discrimination continues to deprive racial and ethnic minorities,

and others, of the opportunity to participate fully in the free

enterprise system." *Id.*  For this reason, the 1978 Report

explained that:

> [T]he bill is designed to foster business ownership by
> socially and economically disadvantaged persons and to
> promote the viability of businesses run by such persons
> by providing contract, financial, technical and
> management assistance. . . .  Although it is expected
> that, as under the present 8(a) program, the majority
> of qualifying firms will be those owned and operated by
> racial and ethnic minorities, the program will be open
> to any business owned by persons who meet the socially
> and economically disadvantaged test.

*Id.* at 14-15.

The final version of Pub. L. No. 95-507 made the following

findings:

> [M]any . . . persons are socially disadvantaged because
> of their identification as members of certain groups
> that have suffered the effects of discriminatory
> practices or similar invidious circumstances over which
> they have no control; that such groups include, but are
> not limited to, Black Americans, Hispanic Americans,
> Native Americans and other minorities.

Pub. L. No. 95-507, § 201, 92 Stat. 1757, 1760 (1978).  The

Conference Report explained that these findings:

> [E]stablish the premise that many individuals are
> socially and economically disadvantaged as a result of
> being identified as members of certain groups. . . .
> In other words, in many, but not all, cases status as a
> minority can be directly and unequivocally correlated
> with social disadvantagement and this condition exists
> regardless of the individual, personal qualities of
> that minority person.

H.R. Rep. No. 1714, at 20-21 (1978).

Representative Joseph P. Addabbo, the floor manager of the

House bill, pointed out that "[o]ur findings clearly state that

34

groups such as Black Americans, Hispanic Americans, and Native Americans, have been and continue to be discriminated against and that this discrimination has led to the social disadvantage of persons identified by society as members of those groups." 124 Cong. Rec. 34097 (1978). Senator Sam Nunn, who managed the bill in the Senate, also emphasized that "[b]ecause of present and past discrimination many minorities have suffered social disadvantagement." *Id.* at 35408 (1978).

The Conference Report expressed the conferees' intention that the authority given to the SBA under Section 8(a) "will be used solely for economic and business development and not merely to channel contracts at a random pace to a preconceived group of eligibles for the sake of social or political goals." H.R. Rep. No. 1714, at 22-23 (1978); *see also* S. Rep. No. 1070, at 2 (1978) ("The purpose of this chapter is to provide a legislative design for the business development services of SBA's 8(a) program so as to insure that the emphasis is placed on business development rather than mere awarding of 8(a) contracts."). In addition, although the conferees intended that the "primary beneficiaries of [the Section 8(a)] program will be minorities," they also recognized "that other Americans may also suffer from social disadvantagement because of cultural bias," and so could participate in the program. H.R. Rep. No. 1714, at 22 (1978).

In 1988, Congress passed substantial revisions to the Section 8(a) program.  *See* Pub. L. No. 100-656, 102 Stat. 3853 (1988).  The House report on that bill described the Section 8(a) program as "the Federal government's most significant effort to redress the effects of discrimination on entrepreneurial endeavors," and stated that the program is intended to "help a broad class of socially and economically disadvantaged individuals to compete in the mainstream of the American economy."  H.R. Rep. No. 460, at 16 (1987).  In addition, the report stated that "[t]he purpose of 8(a) . . . is to create on-going small businesses that can compete on their own once they leave the program. . . .  The 8(a) program is designed to promote the development of firms so that set-asides will not be necessary in the future."  *Id*.

The Senate report on the 1988 amendments stated that the Section 8(a) program:

> [H]as historically been the primary vehicle for guiding federal procurement decisions toward economically disadvantaged minority-owned businesses.  The program has served two critical and complimentary purposes: first, lending an element of fairness to distribution of taxpayer-financed federal procurement contracts, and second, creating opportunities for minority-owned businesses to overcome their historic disadvantage and compete successfully in our bountiful free enterprise economy.

S. Rep. No. 394, at 1 (1988).  Congress continued to express concern about statistical disparities indicating that there may

be discriminatory barriers to minority business formation,

development, and success.

> [M]inorities are still less likely to own a small
> business.  Some 1.8% of the minority population owned a
> business in 1982 compared with 6.4% of all business
> owners.  Moreover, minority-owned firms are smaller
> than nonminority businesses with lower sales and fewer
> employees. . . .  These hearings and the Chairman's
> legislative proposal . . . are an effort to get the
> 8(a) program to focus on its original statutory
> objective.  That objective is simple enough – to boost
> minority ownership of small businesses that can compete
> in a competitive market.

Minority Business Development Program Reform Act of 1987,

Hearings Before the Senate Comm. on Small Business, 100th Cong.,

16-18 (1988) (Statement of Senator Sasser).  The House report

noted:

> [O]nly six percent of all firms are owned by
> minorities; less than two percent of minorities own
> businesses while the comparable percent for
> nonminorities is over six percent; and the average
> receipts per minority firm are less than ten percent
> the average receipts of all businesses.

H.R. Rep. No. 460, at 18 (1987).  Federal procurement data

revealed a similar pattern.  In 1986, total prime contracts

approached $185 billion, while minority-owned businesses received

$5 billion in prime contracts, or about 2.7 percent of the prime

contract dollars.  *Id.*  Echoing the observations of a decade

earlier, the House Report concluded that the disparities between

minority and non-minority business development and success in the

economy and in federal procurement were:

> [N]ot the result of random chance.  The presumption has been
> made by past Congresses, and now reaffirmed by this
> Committee, that discrimination and the present effects of
> past discrimination have hurt socially and economically
> disadvantaged individuals in their entrepreneurial
> endeavors.  It is a legitimate purpose of government to
> correct the imbalance caused by discrimination[.]

*Id.*

### 2.  Subsequent Evidence Before Congress

The parties disagree whether the Court should consider post-enactment evidence of discrimination to find a compelling interest.  DynaLantic argues the Court is limited to the evidence before Congress when it enacted Section 8(a) in 1978 and revised it in 1988, particularly when considering the facial challenge.  *See, e.g.*, Pl.'s MSJ at 38-9; Pl.'s Reply at 5; Pl.'s Opp'n to Mot. for Order to Meet and Confer at 5, Doc. 236.  Defendants, for their part, argue that the Court should consider both earlier and more recent evidence before Congress, the earlier evidence to show that the Section 8(a) program was "appropriately remedial in [its] inception," and the more recent evidence to show a continuing compelling need for the program.  Defs.' MSJ at 15-23; Defs.' Reply Mem. in Supp. of Mot. for Supplemental Briefing at 2, 5, Doc. 237.  The Court agrees with Defendants, and accordingly will consider both direct and circumstantial evidence, including post-enactment evidence introduced by Defendants.

The Supreme Court has held that "the institution that makes the racial distinction must have had a strong basis in evidence to conclude the remedial action was necessary *before* it embarks on an affirmative action program." *Shaw*, 517 U.S. at 910 (citations omitted).  However, nearly every circuit to consider this question has held that reviewing courts may also consider post-enactment evidence.  *See Eng' Contractors v. Metro Dade Cnty.*, 122 F.3d 895, 911 (11th Cir. 1997) (holding that post-enactment evidence may be considered because "a violation of federal statutory or constitutional requirements does not arise with the making of a finding; it arises when the wrong is committed" (quoting *Wygant*, 476 U.S. at 289 (O'Connor, J., concurring))); *see also Adarand VII*, 228 F.3d at 1166; *Concrete Works II*, 36 F.3d at 1521; *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1003-04 (3d Cir. 1993).  Post-enactment evidence is particularly relevant when, as here, the statute is over thirty years old and the evidence used to justify Section 8(a) is stale for purposes of determining a compelling interest in the present.  Moreover, the Small Business Act requires that both the President and the SBA report annually to Congress on the status of small disadvantaged businesses generally and the Section 8(a) program in particular; thus, the statute itself contemplates that Congress will review the 8(a) program on a continuing basis.  15 U.S.C. §§ 631b, 636(j)(16)(B).

Following the Tenth Circuit's approach in *Adarand VII*, the Court reviews the post-enactment evidence in three broad categories: (1) evidence of barriers to the formation of qualified minority contractors due to discrimination, (2) evidence of discriminatory barriers to fair competition between minority and non-minority contractors, and (3) evidence of discrimination in state and local disparity studies.[8]

### a)  Barriers to Minority Business Formation

The government has presented evidence in the form of Congressional investigations, Congressional hearings, and outside studies of statistical and anecdotal evidence regarding obstacles to the formation of minority-owned enterprises.

Most notably, the government has presented significant evidence on race-based denial of access to capital and credit,

---

[8]   The *Adarand VII* court explained that consideration of these three categories were highly relevant to the government's theory – which it also asserts in this case - that "it had essentially become a 'passive participant' in a system of racial exclusion" in the private sector.  228 F.3d at 1167 (citing *Concrete Works II*, 36 F.3d at 1529; *Croson*, 488 U.S. at 492). The court explained that evidence of discriminatory barriers to minority contracting "show a strong link between racial disparities in the federal government's disbursements of public funds for construction contracts and the channeling of those funds due to private discrimination.  The first discriminatory barriers are to the formation of qualified minority subcontracting enterprises due to private discrimination, precluding from the outset competition for public construction contracts by minority enterprises.  The second discriminatory barriers are to fair competition between minority and non-minority [] enterprises, again due to private discrimination, precluding existing minority firms from effectively competing for public construction contracts."  *Id.* at 1167-68.

which has been described as "[o]ne of the most formidable
stumbling blocks to the formation and development of minority
business." U.S. Comm'n on Minority Business Development, *Final
Report* at 12 (1992). Moreover, the government has presented
evidence which shows disparate treatment of similarly situated
minority and non-minority loan applicants. See *Small Business
Administration's 8(a) Minority Business Development Program,
Hearing Before the Senate Comm. on Small Business*, 104th Cong.
178 (1995) (testimony of Fernando V. Galaviz) (independent
studies have found that minorities have a higher probability of
being rejected for loans than non-minority persons with the same
qualifications); *Unconstitutional Set-Asides: ISTEA's Race-Based
Set-Asides After Adarand, Hearing Before the Subcomm. on the
Constitution, Federalism, and Property Rights of the Senate Comm.
on the Judiciary*, 105th Cong. 112 (1997) (testimony of Nancy
McFadden) (non-minority business owners in the construction
industry receive over 50 times more loan dollars than African-
American business owners with identical borrowing
characteristics).

More recent evidence before Congress has shown that racial
discrimination in access to capital has not diminished. Social
scientists conducted statistical analyses of lending patterns
nationally as well as in nine local jurisdictions between 1999
and 2007, including regression analyses to control for a large

number of financial and other characteristics of the firms,
including creditworthiness.  All of the studies have found that
"African-American-owned firms, Hispanic-owned firms, and to a
lesser extent other minority-owned firms are substantially and
statistically significantly more likely to be denied credit than
are White-owned firms," even after controlling for factors other
than race.  Moreover, when minority owned firms did receive a
loan, they were obligated to pay higher interest rates on the
loans than comparable non-minority firms. *See Business Start-Up
Hurdles in Underserved Communities: Access to Venture Capital and
Entrepreneurship Training, Hearing Before the Senate Comm. on
Small Business and Entrepreneurship*, 110th Cong. 2-30 (2008)
(hereinafter *"Start-Up Hurdles"*) (testimony of Jon Wainwright,
Ph.D., social scientist and principal investigator of almost 30
studies on business discrimination since 2000); *How Information
Policy Affects the Competitive Viability of Small and
Disadvantaged Business in Federal Contracting, Hearing before the
Subcomm. on Information Policy, Census, and Nat'l Archives of the
House Comm. on Oversight and Gov't Reform*, 110th Cong. 27-28, 66-
67 (2008) (hereinafter *"Information Policy"*); *The Department of
Transportation's Disadvantaged Business Enterprise Program,
Hearing Before the House Comm. on Transportation and
Infrastructure*, 111th Cong. 291-92, 329-31 (2009) (hereinafter
*"DOT's DBE Program"*).

In addition to quantitative analysis of lending discrimination, Congress has heard significant qualitative testimony regarding lending discrimination. *See, e.g.*, *Encouraging the Growth of Minority-Owned Small Businesses and Minority Entrepreneurship, Hearing Before the House Comm. on Small Business*, 107th Cong. at 20 (2001) (testimony of Don Furtivo); *id.* at 45-47 (submission by U.S. Hispanic Chamber of Commerce) (stating that banks believe that loans to minorities involve high risk); *Availability of Credit to Minority-Owned Small Businesses, Hearing Before the Subcomm. on Financial Institutions Supervision, Regulation, and Deposit Insurance of the House Comm. on Banking, Finance, and Urban Affairs*, 103d Cong. 22 (1994) (testimony of Harrison Boyd) (hereinafter "*Availability of Credit*"); *Problems Facing Minority and Women-Owned Small Businesses in Procuring U.S. Government Contracts, Hearing Before the Subcomm. on Commerce, Consumer, and Monetary Affairs of the House Comm. on Government Operations*, 103d Cong. 45-49 (1993) (testimony of Sherman N. Copelin, Jr.) (opining that most problems faced by African-American businesses stem from a pervasive and extremely negative perception that African-American businesses and their owners are not good financial risks, that African-American businesses are "second rate," and that African-American business owners will not pay their debts and are incapable of operating profitably in a

competitive mainstream business environment); *Federal Minority Business Programs, Hearing Before the House Committee on Small Business*, 102d Cong. 8-9 (1991) (testimony of Joshua I. Smith) (observing that "tremendously negative" perception of minorities' business skills has impeded their ability to obtain capital and credit); *Availability of Credit*, at 1 (Opening Statement of Representative Richard Neal); *Small Business Development, Hearing Before the Subcomm. on Procurement, Tourism, and Rural Development of the House Comm. on Small Business*, 102d Cong. 9, 60 (1992) (testimony of Doris Jefferies Ford, Ph.D.); *Summary of Activities: A Report by the House Comm. on Small Business*, H.R. Rep. No. 108-800, at 150-53 (2004); *Availability of Capital and Federal Procurement Opportunities to Minority-owned Small Businesses, Hearing before the House Small Business Committee*, 108th Cong. 3, 48 (2004) (statements of Honorable Danny Davis, noting that in Illinois, less than two percent of federal contracts went to minorities in 2002 and that traditional lending institutions are less likely to provide capital to minority-owned businesses).

Evidence has also been presented to Congress that minorities are routinely excluded from critical business relationships, particularly through closed or "old boy" business networks that make it especially difficult for minority-owned businesses to obtain work. *See, e.g.*, *Problems Facing Minority and Women-Owned*

*Small Businesses in Procuring U.S. Government Contracts, Hearing Before the Subcomm. on Commerce, Consumer, and Monetary Affairs of the House Comm. on Government Operations*, 103d Cong. 97 (1993) (testimony of Joseph A. Williams) (explaining that minorities and women are often left out of the design or planning phase for public contracts); *Meaning and Significance for Minority Businesses of the Supreme Court Decision in the City of Richmond v. J.A. Croson Co., Hearing Before the Subcomm. on Legislation and National Security of the House Committee on Government Operations,* 101st Cong. 129-31 (1990) (testimony of James M. Bond, Jr.) (stating that "pervasive" discrimination in selection of architects for important buildings and professional advancement limits African-American and Hispanic architects' access to capital and work in the non-minority community) (hereinafter *"The Significance of Croson"*); *To Amend The Civil Rights Act of 1964: Permitting Minority Set-Asides, Hearing Before the Senate Comm. on Governmental Affairs*, 101st Cong. 14-15 (1990) (testimony of William Bowen) (noting that closed business networks deprive minority-owned firms of business opportunities).

On November 10, 2005, Senator Edward M. Kennedy spoke before the Senate concerning DoD's use of race-conscious measures, including the Section 8(a) program.  151 Cong. Rec. S12668-01, 2005 WL 3018127 (Nov. 10, 2005).  He observed that federal

45

government contracting "has long been dominated by 'old-boy' networks that make it very difficult for African Americans, Latinos, Asians, and Native Americans to participate fairly," and that "[y]ears of Congressional hearings have shown that minorities historically have been excluded from both public and private construction contracts in general, and from Federal defense contracts in particular." *Id.*  Recent evidence before Congress establishes that minorities continue to experience barriers to business networks.  *See, e.g.*, *DOT's DBE Program*, at 16, 207-208, 223, 310-12 (testimony from Joel Szabat, Deputy Assistant Secretary for Transportation Policy at DOT, and others discussing evidence of discriminatory exclusion of minority firms from business networks, and the difficulty of trying to break into those networks); *Information Policy*, at 59, 62, 67, 69 (same).

In addition to the lending discrimination studies discussed above, discriminatory barriers to minority business formation have been quantified in a number of recent statistical studies before Congress.  Since 2006, over fifty state and local disparity studies, conducted in twenty eight states and the District of Columbia, have been introduced or discussed at Congressional hearings.  *See, e.g.*, *The Minority Business Development Agency: Enhancing the Prospects for Success, Hearing Before the Subcomm. on Commerce, Trade and Consumer Protection of*

46

*the House Comm. on Energy and Commerce*, 111th Cong. 5-6 (2009)
(testimony of David Hinson) & App. B; *DOT's DBE Program*, 8-9, 312
(testimony of Joel Szabat); *The Federal Aviation Administration
Reauthorization Act of 2009, Hearing Before the House Comm. on
Transportation and Infrastructure*, 111th Cong. 483 (2009)
(testimony of Gene Roth); *Infrastructure Investment: Ensuring an
Effective Economic Recovery Program, Hearing before the House
Comm. on Transportation and Infrastructure*, 111th Cong. 353-54
(2009) (testimony of Gene Roth); *Information Policy*, at 19-22
(testimony of Jon Wainwright); *id*. at 55, 59-60 (testimony of
Anthony Brown); *Start-Up Hurdles*, at 1 (testimony of Rodney
Strong); *id*. at 3 (testimony of Dan O'Bannon); *Minority
Entrepreneurship*: *Assessing the Effectiveness of SBA's Programs
for the Minority Business Community, Hearing Before the Senate
Comm. on Small Business and Entrepreneurship*, 110th Cong. 26
(2007) (hereinafter "*Minority Entrepreneurship*") (testimony of
Jon Wainwright).

Disparity studies are statistical studies performed for
state and local governments, generally by outside consultants.
They are designed to measure the availability and utilization of
minority and women-owned firms on public contracts.  The studies
address a variety of industries in a variety of state and local
markets.  In addition, some of the studies examine the
availability and utilization of minority and women-owned firms in

the private contracting market.  Many of these disparity studies include statistical analysis of minority business formation.  The studies are not uniform in nature, methodology, or results.  On balance, however, they reveal large, statistically significant barriers to business formation among minority groups that cannot be explained by factors other than race.  The following four studies are examples.

A 2009 Arizona study considered the likelihood of self-employment among minorities as compared to non-minorities, applying the methodology employed by a Denver disparity study that was approved by the Tenth Circuit in *Concrete Works IV.*  The study controlled for factors including marital status, age, health, household property value, mortgage payments, unearned income, and level of education.  The study found white males were roughly twice as likely to be self-employed as African Americans and Hispanic Americans in all industries in the state of Arizona.  Over seventy percent of the disparity in self employment rates among African Americans, Hispanic Americans, and Native Americans was attributable to race differences.  *See Availability Analysis and Disparity Study for the Arizona Dep't of Transp.: Final Report*, MGT of America, Inc., § 7.7 (March 16, 2009) (hereinafter "*Arizona Study*").

Likewise, a 2006 study in Atlanta, Georgia, found that after controlling for age, wealth, and other variables, minorities

continue to show disparities in entry into self-employment.  In the construction and service industries, non-minority men were between two and three times as likely to be self-employed as African Americans and Asian Americans.  *City of Atlanta Disparity Study and Legal Analysis*, *The Executive Summary*, Griffin & Strong, P.C., at 16 (October 11, 2006) (hereinafter "*Atlanta Study*").

A 2006 Maryland study conducted a regression analysis to analyze race disparities in business formation between similarly situated minorities and White males.  The study found that in the construction industry in Maryland, the business formation rate-- as compared to White males--is 29-62 percent lower for African Americans, 35-51 percent lower for Hispanic Americans, 45-50 percent lower for Native Americans, and between 12 percent higher and 42 percent lower for Asian Americans.  The study concluded that "observed [minority business] availability levels in the State of Maryland are substantially and statistically lower than those that would be expected . . . if commercial markets operated in a race- . . . neutral manner.  This suggests that minorities . . . are substantially and significantly less likely to own their own businesses as a result of discrimination than would be expected based upon their observable characteristics including age, education, geographic location, and industry." *See Race, Sex, and Business Enterprise: Evidence from the State of Maryland*

49

*(Final Report)*, NERA Economic Consulting, at 120 (March 8, 2006)(hereinafter "*Maryland Study*").

A 2007 study conducted in Nevada examined the rates of business ownership in the construction and engineering industries. The study employed a multivariate regression analysis to control for factors including personal financial resources, creditworthiness, age, education, family characteristics, and ability to speak English. After accounting for neutral factors, the study showed identifiable negative disparities in business ownership rates for Asian Americans and Native Americans, and significant negative disparities in business ownership rates for Hispanic Americans and African Americans. Specifically, the study found that there were "only 18 percent as many African American-owned construction businesses in Nevada as one would anticipate if African Americans working in the industry owned businesses at the same rate as similarly situated non-Hispanic white males," and only 48 percent as many Hispanic-owned construction businesses. *Availability and Disparity Study, Nevada Dep't of Transp.*, BBC Research & Consulting, Appendix H pp. 4-6 (June 15, 2007) (hereinafter "*Nevada Study*").

**b)   Barriers to Minority Business Development**

In addition to barriers to minority business formation, the government has presented significant evidence of barriers to development by existing minority businesses.  Specifically, the government presents evidence of discrimination by prime contractors, private sector customers, suppliers, and bonding companies.

For example, Andrew F. Brimmer and F. Ray Marshall, the authors of a study on minority businesses, testified about the barriers that confront existing minority-owned businesses. Brimmer identified discriminatory practices including denial of opportunities to bid, discrimination in bonding, customer end-user discrimination, closed business networks, discrimination in subcontracting, bid shopping, bid manipulation, price discrimination by suppliers, discrimination in financing, and discrimination in employment opportunities.  *See City of Richmond v. J.A. Croson: Impact and Response, Hearing Before the Subcomm. on Urban and Minority-Owned Business Development of the Senate Committee on Small Business*, 101st Cong. 33-35 (1990) (testimony of Andrew F. Brimmer).

Marshall testified that minority-owned businesses are often not invited to bid for private sector contracts because of negative perceptions about minorities in business.  Therefore, minority-owned businesses have little opportunity to obtain work in the private sector.  Marshall reported that public-sector

contracts account for ninety-three percent of minority-owned contractors' business in Atlanta while private sector contracts make up eighty percent of non-minority contractors' business. Moreover, the size of the public contracts obtained by minority-owned contractors is much smaller than the size of the contracts obtained by non-minority-owned contractors, making it harder for the minority-owned contractors to develop their businesses. *Id.* at 45-48 (testimony of F. Ray Marshall).

Marshall also testified that minorities are more disadvantaged in business than they are in any other area, and that the Atlanta study's findings are not unique to that city, but are typical of most major U.S. cities. *Id.* at 46, 128. Additional Congressional hearings confirm that such discrimination occurs around the country. *See, e.g., Encouraging the Growth of Minority-Owned Small Businesses and Minority Entrepreneurship, Hearing Before the House Comm. on Small Business*, 107th Cong. (2001) (field hearing in Albuquerque, New Mexico); *Small Business Administration's 8(a) Minority Business Development Program, Hearing Before the Senate Comm. on Small Business Administration's 8(a) Minority Business Development Program, Hearing Before the Senate Comm. On Small Business*, 104th Cong. 164 (1995) (testimony of Nancy E. Archuleta) (disparity study conducted for the State of Texas found widespread marketplace discrimination against women and minorities,

especially African-Americans and Hispanic Americans); *Problems Facing Minority and Women-Owned Small Businesses in Procuring U.S. Government Contracts, Hearing Before the Subcomm. on Commerce, Consumer, and Monetary Affairs of the House Comm. on Gov't Operations*, 103d Cong. 42-51 (1993) (field hearing in Chicago); *The Significance of Croson* (testimony of Gloria Molina) (Hispanic American community continues to suffer from the long history of discrimination in Los Angeles).

More recent evidence before Congress is consistent with the earlier evidence, demonstrating that discrimination by prime contractors, private sector customers, suppliers and bonding companies continues to limit minority business development.  Some of this evidence is quantitative, set forth in some of the state and local disparity studies presented to Congress between 2006 and 2009.  While the studies are not uniform in nature, methodology, or results, they contain powerful evidence that discrimination "fosters a decidedly uneven playing field" for minority business entities seeking to compete in federal contracting.  *See Adarand VII*, 228 F.3d at 1170.  The following studies are presented as a sample of the quantitative evidence before Congress.

A 2006 Maryland study explained that discrimination by commercial customers and suppliers can be statistically shown by disparities between minority and non-minority business owner

earnings.  *Maryland Study*, at 117.  Controlling for age, time, education, labor market experience, geography and industry, the study found that, in the economy as a whole and for industries in Maryland in particular, there exist "negative and statistically significant and large business owner earnings disparities for Blacks, Hispanics, Asians, [and] Native Americans. . . .  The measured difference for Blacks ranges between 28 and 59 percent [less than similarly situated non-minority owners]; for Hispanics, from 19 percent to 39 percent; for Asians, from 4 percent to 22 percent; and for Native Americans, from 38 percent to 51 percent."  *Maryland Study*, at 111, 115-16.  Similar findings were reported in Arizona.  *See Arizona Study,* § 7.7 (controlling for factors including marital status, age, health, household property value, mortgage payments, unearned income, and level of education, all self-employed minorities in Arizona reported significantly lower earnings than their majority counterparts in all industries).  An Atlanta study likewise found that when minorities in Atlanta are self-employed, "they earn significantly less than non-minority males.  Across all industries, after controlling for other factors, African Americans earned 30 percent less . . . than non-minority males from self-employment. . . .  More than half the disparity in self-employment income between non-minority males and African Americans was attributable to race."  *Atlanta Study*, at 7.

54

Finally, a 2009 study on a wide variety of industries in San
Antonio, Texas, found statistically significant differences in
earnings from self-employment for Hispanic Americans and African
Americans as compared to white males, even after controlling for
education, age, and other variables. *San Antonio Regional*
*Business Disparity Causation Analysis Study: City of San Antonio,*
*Texas*, MGT of America, Inc. § 9-7 (April 7, 2009) ("*San Antonio*
*Study*"). In addition, the study controlled for company age,
capacity, ownership level of education and experience, and number
of employees, and found that even after controlling for all of
those factors, minority status "had a negative effect on company
earnings of all minority groups except for Hispanic Americans."
*Id.* § 9-9.

In addition to the quantitative data, Congress heard
qualitative testimony that these problems are "strikingly similar
across the country" and in a variety of industries. Minority
business owners consistently report that they "encounter
significant barriers to doing business in the public and private
sector marketplaces, as both prime contractors and
subcontractors," that they "often suffer from stereotypes about
their suspected lack of competence and are subject to higher
performance standards than similar nonminority men," and that
they "encounter discrimination in obtaining loans and surety
bonds; receiving price quotes from suppliers; working with trade

unions; obtaining public and private sector prime contracts and subcontracts; and being paid promptly." *DOT's DBE Program* at 331 (testimony of Jon Wainwright); *See also Information Policy* at 20-28 (testimony of Jon Wainwright); *Minority Entrepreneurship* at 27, 33-34 (testimony of Jon Wainwright that, based on his statistical studies as well as hundreds of questionnaires and interviews with minority and non-minority business owners, "without the use of affirmative remedies such as subcontracting goals, minorities and women would receive few if any opportunities on government contracts. . . . Prime contractors who solicit M/WBEs on goals projects rarely do so in the absence of goals").

Congress has also amassed evidence that discrimination and entrenched patterns resulting from years of exclusion prevent minority business owners from obtaining surety bonds, which are generally required by federal and state procurement rules. *See Adarand VII*, 228 F.3d at 1171-72 ("Minority subcontracting enterprises in the construction industry find themselves unable to compete with non-minority firms on an equal playing field due to racial discrimination by bonding companies."). In its 1994 report about the problems facing minority and women-owned small businesses, the House Committee on Government Operations found that an "[i]nability to obtain bonding is one of the top three reasons that new minority small businesses have difficulty

procuring U.S. Government contracts." H.R. Rep. No. 103-870 (1994). Witnesses also testified that prime contractors sometimes set bonding requirements at an unnecessarily high level, which then effectively excludes a large percentage of minority owned businesses who are unable to secure the required level of bonding. *Information Policy* at 62, 67 (testimony of Anthony Robinson); *id.* at 92 (testimony of Anthony Brown); *see also DOT's DBE Program* at 311 (testimony of Joel Szabat).

### c) State and Local Disparity Studies

#### (1) History of Disparity Studies in this Case

Following the Supreme Court's decision in *Croson*, there have been hundreds of disparity studies placed before Congress. These statistical studies have undertaken "to assess the disparity, if any, between availability and utilization of minority owned businesses in government contracting." *Adarand VII*, 228 F.3d at 1172 (citing *Appendix – The Compelling Interest for Affirmative Action in Federal Procurement*, 61 Fed. Reg. 26,042, 26,061-62 (1996) (presenting the Urban Institute's analysis of thirty nine disparity studies)); *see also* Defs.' Supplemental Br. on the Effect of the 2006 Reauthorization of DoD Program at 13 n.7, Doc. No. 230 (discussing introduction of new evidence from fifteen state and local disparity studies); Joint Report and Notice of Filing, Dec. 24, 2009, Doc. No. 238 (identifying approximately

fifty additional state and local disparity studies).  Since *Croson* and *Adarand*, courts have examined these studies and subjected them to varying degrees of analysis.  *Compare Concrete Works IV*, 321 F.3d at 962-69 (analyzing studies in minute detail), *with Adarand VII*, 228 F.3d at 1172-74 and *Sherbrooke*, 345 F.3d at 969-71 (looking at studies' conclusions more generally).[9]

As a threshold matter in this case, as DynaLantic points out, although Defendants have placed significant evidence regarding disparity studies into the record, they have not relied heavily on those studies.  Pl.'s Mem. on Evidence Presented to Congress After Jan. 4, 2006 at 7-8, Doc. No. 240.  Indeed, in the last round of briefing in this case, Defendants placed approximately 50 disparity studies into the record with little or no analysis.  *See generally* Defs.' Supplemental Br. on Evidence Presented to Congress After Jan. 4, 2006, Doc. No. 239.  Likewise, while DynaLantic attacked a few of the older disparity studies presented by the government in earlier briefing, it did not attempt to do so with regard to the fifty most recent studies

---

[9] As the Tenth Circuit noted, "the conclusions of virtually all social scientific studies may be cast into question by criticism of their choices and methodologies.  The very need to make assumptions and to select data sets and relevant variables precludes perfection in empirical social science."  *Adarand VII*, 228 F.3d at 1173 n.14.  Accordingly, "[a]n analysis is not devoid of probative value simply b]ecause it may theoretically be possible to adopt a more refined approach[.]"  *Contractors Ass'n of E. Pa.*, 91 F.3d at 603.

before Congress.  *See generally* Pl.'s Mem. on Evidence Presented to Congress After Jan. 4, 2006.

Given the nature of the claims at issue in this case, the Court agrees with the parties that it is unnecessary to examine the vast amount of statistical evidence before it in the level of detail that, for example, the Tenth Circuit examined the evidence in *Concrete Works IV*.  *See* 321 F.3d at 960-70, 974-90.  The first claim is DynaLantic's facial challenge to the statute.  As set forth above, DynaLantic cannot win on its facial challenge unless it persuades the Court that the evidence before Congress is so poor that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.  The second claim is DynaLantic's challenge to the Section 8(a) program as applied to the military simulation and training industry.  However, the parties agree that Defendants have no evidence of discrimination, either in the public or private sector, in the simulation and training industry.  *See* Pl.'s Statement of Undisputed Material Facts at ¶¶ 140-50.

### (2)  Legal Standard for Strong Basis in Evidence Under *Croson*

Although this case does not require meticulous analysis of the tens of thousands of pages of data in the record, the principles articulated by the Supreme Court in *Croson* and this Circuit in *O'Donnell* still apply.  In *Croson*, the Supreme Court rejected a 30 percent minority set aside for city construction

contracts in Richmond.  The city presented evidence of the small number of minority businesses relative to the general population, the small number of minority city contracts relative to the number of minority businesses, and the low minority participation in training programs and unions.  *Croson*, 488 U.S. 498-99.  The Supreme Court rejected the evidence as insufficient to justify the race-conscious measures in the ordinance because the measures "could not in any realistic sense be tied to any injury suffered by anyone."  *Id.* at 499.

> While there is no doubt the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. . . . [A]n amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.

*Id.*  Put another way, the Court found that the low level of minority entry into, and participation in, the construction industry did not justify race-based remedial measures absent evidence from which an "inference of discriminatory exclusion could arise."  *Id.* at 503, 508.

The *Croson* Court then explained that the government could meet its burden by demonstrating that there were *eligible* minorities in the relevant market - in that case, the Richmond construction industry - that were denied entry or access notwithstanding their abilities.  *Id.* at 502-03 (city could demonstrate discrimination in skilled industry such as

construction by showing there was a pool of minorities "qualified to undertake the particular task" of construction contracting who were nevertheless excluded from that type of work; city could present evidence of discriminatory exclusion from training programs or professional associations by showing a statistical disparity between minorities eligible for membership and actual minority membership).

Following *Croson*, this Circuit's decision in *O'Donnell* likewise instructs that data comparing raw numbers of minorities and contract dollars is, without more, "constitutionally meaningless." 963 F.2d at 426. In order to be compelling, data must test the hypothesis that "discrimination caused the low percentage" of minorities in the relevant market. *Id.* ("[m]inority firms may not have bid on . . . construction contracts because they were generally small companies incapable of taking on large projects; or they may have been fully occupied on other projects; or the District's contracts may not have been as lucrative as others available in the Washington metropolitan area; or they may not have had the expertise needed to perform the contracts; or they may have bid but were rejected because others came in with a lower price."). With these principles in mind, the Court turns to the disparity studies.

### (3)  The Post-2006 Disparity Studies

As noted above, Defendants submitted over 50 disparity studies, encompassing evidence from 28 states and the District of Columbia, which have been before Congress since 2006. *See generally* Joint Report and Notice of Filing, Doc. No. 238; Defs.' Supplemental Br. on Post-2006 Evidence, at 8, Doc. No. 239. Nearly all of the studies included the construction industry and construction related services, and approximately seventeen of the studies are limited to that industry.  The remaining studies addressed a variety of industries in addition to construction: professional services (generally including accounting, legal, consulting, medical, and educational), architecture and engineering, general commodities/goods, and "other services" such as janitorial and maintenance services and security guards.

As might be expected from such a broad variety of studies, they varied in method, depth, breadth, and rigor.  The Court found some of the studies without value and accordingly did not rely upon them. *See, e.g.*, *City of Bridgeport Disparity Study Regarding Minority Participation in Contracting*, Mason Tillman Assocs. (Aug. 2005) (portion of study provided contains no analysis or explanation); *Race, Sex & Business Enterprise: Evidence from the State of Illinois and the Chicago Metropolitan Area*, NERA, (June 20, 2006) (same).  One of the studies found no discrimination. *See Consortium Disparity Update Prepared for City of Albany, Georgia*, BBC Research & Consulting (Aug. 20,

2008).  Most of the studies showed varying amounts of disparities and discrimination among industries and different minority groups.  Some of the studies were unable to meaningfully analyze certain minority groups because of the small sample size of contractors from these groups.  Many of the studies did not distinguish between Asian Pacific Americans and Subcontinent Asian Americans, as the Section 8(a) program does.  *See* 13 C.F.R. § 124.103(b)(1).

The Court reviewed the studies with a focus on two indicators which other courts have found relevant in analyzing disparity studies.  First, the Court considered the disparity indices calculated.  A disparity index is generally calculated by dividing the percentage of MBE, WBE, and/or DBE firms *utilized* in the contracting market by the percentage of M/W/DBE firms *available* in the same market.  Normally, a disparity index of 100 demonstrates full M/W/DBE participation; the closer the index is to zero, the greater the M/W/DBE disparity due to underutilization.  *See, e.g.*, *Concrete Works IV*, 321 F.3d at 962.  Second, the Court reviewed the method by which the studies calculated the *availability* and *capacity* of minority firms.  Some courts have looked closely at these factors to evaluate the reliability of the disparity indices, reasoning that the indices are not probative unless they are restricted to firms of significant size and with significant government contracting

63

experience.[10]  *See, e.g., Rothe VII*, 545 F.3d at 1040-46; *Eng'g
Contractors Ass'n of S. Fla., Inc.*, 122 F.3d at 914, 917.  While
not all of the studies addressed these factors, a significant
portion did so, and most (although not all) found significant
disparities between availability and utilization of minority
contractors.  These studies demonstrate that qualified, eligible
minority-owned firms are excluded from contracting markets, and
accordingly provide powerful evidence from which an "inference of
discriminatory exclusion could arise." *Croson*, 488 U.S. at 503,
508.  The following studies, among others, used relatively narrow
measurements of availability and/or conducted relatively detailed
capacity analyses.

    A 2008 study in Alaska examined disparities in public sector
minority contracting across a wide range of industries, including
architecture and engineering, commodities, construction, design-
build, manufacturing, and professional services.  *Alaska*

---

    [10]  Other studies have disputed the value of capacity
analysis, explaining that "M/WBEs may be smaller, newer, and
otherwise less competitive than non-M/WBEs because of the very
discrimination sought to be remedied by race-conscious
contracting programs.  Racial and gender differences in these
'capacity' factors are the *outcomes* of discrimination and it is
therefore inappropriate as a matter of economics and statistics
to use them as control variables in a disparity study." *Race,
Sex & Business Enterprise: Evidence from Memphis, Tennessee*, NERA
55 (2008).  The Court agrees that discriminatory barriers to
formation and development, discussed above, would impact
capacity.  However, as discussed above, *Croson* and *O'Donnell*
require the additional showing that eligible minority firms
experience disparities, notwithstanding their abilities, in order
to give rise to an inference of discrimination.

*Disadvantaged Business Enterprise Study*, D. Wilson Consulting
Group, LLC at 4-6 (June 8, 2008) (hereinafter "*Alaska Study*").
The study examined availability by creating a master database
from, *e.g.*, census figures, city and state vendor data, and
member lists from minority professional associations, then
"filtered the data to extract a subset of qualified, willing and
able firms."  Specifically, the study accounted for the firms'
reported revenue generation, the past procurement history of the
agency, and businesses licences and other specialty
qualifications.  *Alaska Study*, at 4-3 - 4-5.  The study also
measured firm capacity by considering the size of each firm's
past bids, past revenue generated, and revenue generation
capacity.  Based on these factors, the study divided the firms
into two categories for purposes of measuring availability: prime
contractor availability and subcontractor availability.  *Id.* at
4-8.  The study found significant disparities between utilization
and availability of minority-owned DBEs, in all industries, by
the Alaska Department of Transportation and the Municipality of
Anchorage.  *Id.* at vi; *see also*, *e.g.*, 5-73 (between 2002 and
2006, in all industry categories combined and where a disparity
index of under 80 is significant, disparity indices were as
follows -- African-American: 4.88, Native American: 28.99, Asian
American: 5.14; Hispanic American: 44.29).

A 2006 study of the New Jersey construction services industry narrowly measured minority contractor availability.  The pool of available minority contractors was comprised almost entirely – over 97.5 percent - of contractors who had been precertified/prequalified to perform the relevant work by the state, had bid on the work, or had actually been awarded public contracts in the past.  *State of New Jersey Construction Services Disparity Study 2003-2004*, Mason Tillman Assoc., Ltd. at 5-6 (June 2006).  The study also controlled for capacity by considering the size of the State's awarded prime contracts and the largest contracts awarded to various MBE businesses.  The study concluded that MBEs in the state did not have the capacity to bid on the larger contracts; accordingly, the disparity study was restricted to an examination of contract awards of $500,000 and under.  *Id.* at 5-9, 5-16.  The study found significant disparities between utilization and availability, in almost all respects, for minority contractors contracting with State Agencies, Authorities and Commissions, as well as State Colleges and Universities.  *See id.* at 1-2 - 1-5.  The study found significant disparities in all forms of contracting: informal contracting, sub-contracting and prime-contracting.  Disparities were statistically significant for African Americans, Hispanic Americans, Asian Americans and, to a lesser extent, Native Americans.  *Id.*

A 2008 study encompassing construction, architecture and
engineering, professional services, other services, and goods and
supplies in Dayton, Ohio narrowly measured availability for prime
contracts by including only firms that had bid on or performed
work for the city, or had registered with the city to be
considered for such work.  *A Second-Generation Disparity Study
for the City of Dayton, Ohio*, MGT of America, Inc. at 4-6 (Aug.
8, 2008).  The study considered both public contracting and
private sector construction contracting.[11]  In public
contracting, the study revealed significant disparities between
availability and utilization of all minority contractors among
all industries, with the exception of the public prime
construction contracts, in which Asian-Americans were
overutilized.  *See Id*. at 5-3 - 5-14.  In the private market, the
disparities were even more significant, at both the prime and
subcontracting level, for all minorities including Asian-
Americans.  *Id*. at 7-7.  The study observed:

> Due to exclusionary laws and years of discrimination,
> MBEs/WBEs have entered the marketplace only recently, from a
> historical perspective, when compared with nonminority
> firms.  They thus tend to be smaller than more established
> and older nonminority male-owned firms, which, in turn,
> limit their capacity not only to undertake large-scale

---

[11]  In many of the disparity studies, even the ones that
analyzed public contracting across a wide range of industries,
private sector analysis seemed to be limited to the construction
industry.  It appears that this is because significant public
data - such as building permits - is available for private sector
construction projects.

construction projects but also to access capital and other
advantages in bonding and insurance.

*Id.* at 7-24.  The study further concluded, however, that capacity
alone did not account for the disparities between availability
and utilization, particularly in the private sector, and
concluded that the disparities were so large that they could be
credibly ascribed to discrimination.  *Id.*

The Nevada study narrowly measured the availability of
minority firms in the state's transportation construction and
engineering industries, looking only at firms which had a past
history of performing the relevant work in the public sector or
had bid on such work, were qualified to perform the tasks, and
had the capacity to perform prime contracts (or alternatively,
subcontracts).  *Nevada Study,* § II at 10.  The study also
specifically controlled for capacity (by looking at the size of
contracts firms had bid on and been awarded in the past) to see
if minority-owned firms had higher or lower bid capacity than
similarly situated majority contractors.  *Id.*, App. H. at 13-16.
The study found that capacity was unlikely to be a deterrent to
obtaining work for many minority contractors, because "African
American, Asian-Pacific American, and Subcontinent Asian
Americans are more likely to have above median bid capacity than
majority-owned firms." *Id.*, App. H. at 15.  Nevertheless, the
study found evidence of significant disparities for each
racial/ethnic group in the federally-funded construction and

engineering contract awards.  Specifically, where a disparity index under 80 is considered significant, the disparity indices were as follows: African Americans: 32, Asian-Pacific Americans: 3, Subcontinent Asian Americans: 28, Hispanic Americans: 57, Native Americans: 25.  In state-funded contracts, the disparity indices were as follows: African Americans: 36; Asian Pacific Americans: 5, Subcontinent Asian Americans: 304 (indicating overutilization), and Hispanic Americans: 26.  *Id.*, § IV, at 14-15.

The San Antonio study examined disparities in public sector contracting in several industries: (1) construction, (2) architecture and engineering, (3) professional services such as financial, legal, and educational, (4) other services such as security guards, computer technology, and janitorial/maintenance services, and (5) goods contracts.  The study also examined disparities in the private sector in construction.  The study found substantial disparity for African Americans, Asian Americans, and Native Americans in all industries for public sector prime contracting as well as subcontracting, and substantial disparities for Hispanic Americans in architecture and engineering, professional services, and goods contracting.  *San Antonio Study* at I-ii.  Minority utilization in private sector construction was, by a significant margin, lower still.  Utilization of minority and women-owned businesses "was low in

absolute terms (close to 1 percent), in comparison to M/WBE
subcontractor utilization on [City] projects (about 24.5
percent)[.]" *Id.* at iv.  The study considered minority owned
firms' capacity to perform the work as a possible explanation for
the disparities, but ultimately rejected that possibility.

> Capacity alone is not a sufficient explanation for these
> differences, especially at the subcontractor level in the
> construction industry, where capacity is a lesser
> consideration and availability far exceeds the record of
> utilization, especially in the private sector.  When private
> sector M/WBE utilization at the subcontractor level for
> commercial building projects is only a fraction of public
> sector M/WBE utilization, there is evidence, supported by
> anecdotal [evidence], that a number of non-M/WBE firms
> utilized for public sector construction projects employ
> M/WBE subcontractors primarily because the municipality
> encourages them to do so[.]

*San Antonio Study* at § 6-8.

The Atlanta study undertook a similar analysis in the
construction and professional services industries and reached
similar conclusions.  "[M]inority firms won less than 1 percent
of private sector commercial subcontracts . . . in the Atlanta .
. . area," a small fraction of the percentage of subcontractors
used on City projects.  *Atlanta Study*, at 8.  "There is evidence
that lack of business capacity and experience is not a sufficient
explanation for the low levels of utilization in the private
sector.  Low levels of utilization were found not only in
subcontracting, but also on small contracts.  Moreover, a private
sector regression analysis, after controlling for the effects of
variables related to company capacity, years in the business and

education of the owner, determined that race and gender were significant factors in explaining the significantly lower earnings of minority and female firms." *Id.*, at 9.

### D. Analysis: Strong Basis in Evidence

For the reasons discussed in Section III.B. above, the Court concludes that the government has articulated a compelling interest for the Section 8(a) program: "breaking down barriers to minority business development created by discrimination and its lingering effects," including exclusion from contracting with the federal government. Defs.' MSJ at 27, 29. As a matter of law, the government may implement race-conscious programs that seek "to remedy its own discrimination or even to prevent itself from acting as a 'passive participant'" in private discrimination in the relevant industries or markets. *Concrete Works IV*, 321 F.3d at 958 (quoting *Croson*, 488 U.S. at 492). The Court must now determine whether the government has demonstrated "'a strong basis in the evidence' supporting its conclusion that race-based remedial action was necessary to further that interest." *Sherbrooke*, 345 F.3d at 969 (quoting *Croson*, 488 U.S. at 500).

DynaLantic has challenged the Section 8(a) program both on its face and as applied to the military simulation and training industry. The Court considers each in turn.

### 1.   Facial Challenge

The Court turns first to DynaLantic's facial challenge.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

The text of the Section 8(a) statute does not mandate set-asides in all government contracting.  Rather, it provides "[i]t shall be the duty of the [Small Business] Administration and it is hereby empowered, *whenever it determines such action is necessary or appropriate*" to enter into contracts with federal agencies, and to arrange for performance of those contracts by socially and economically disadvantaged businesses.  15 U.S.C. §§ 637(a)(1)(A), (a)(1)(B) (emphasis added).  In order to find the statute facially constitutional under *Salerno*, therefore, the Court must determine whether Congress had a strong basis in evidence to conclude that, under any set of circumstances, it would be necessary and appropriate for the SBA to exercise its power.  Put another way, in order for DynaLantic to prevail on its facial challenge, it must show that Congress did not have a strong basis in evidence for permitting race-conscious measures to be used under any circumstances, in any sector or industry in the economy.  For the reasons set forth below, the Court concludes that DynaLantic cannot meet its "heavy burden" to

establish that the 8(a) program is unconstitutional on its face. *Salerno*, 481 U.S. at 745.

### a)   The Government's Initial Burden

As discussed in Section III.A *supra*, the Court must first determine whether the government has met its initial burden to present a "strong basis in evidence" sufficient to support its compelling interest.  At that point, the burden shifts to DynaLantic to introduce "credible, particularized evidence to rebut the government's initial showing of the existence of a compelling interest." *Adarand VII*, 228 F.3d at 1175.  "The ultimate burden remains with the [plaintiff] to demonstrate the unconstitutionality of an affirmative action program." *Wygant*, 476 U.S. at 277-78 (plurality op.).

Upon careful consideration of the evidence presented by the government, the Court concludes that the government has met its initial burden of presenting a strong basis in evidence that remedial action was - and remains - necessary to remedy nationwide discrimination in the construction industry, at the very least, and likely in other industries as well.

Before enacting Section 8(a) in 1978, Congress had before it not only all of the evidence in the legislative history of Section 8(a), but also all of the evidence in the legislative history of another race-conscious measure it had enacted the previous year, the Public Works Employment Act of 1977.  The

73

evidence regarding the Public Works Act is relevant because, "[a]fter Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area." *Fullilove v. Klutznick*, 448 U.S. 448, 502 (1980) (Powell, J., concurring).  The Public Works Act of 1977 included an MBE program which required that ten percent of federal funding for any state or local public works project be awarded to minority business enterprises.  Non-minority contractors raised an equal protection challenge to the MBE program, and the Supreme Court considered its constitutionality in *Fullilove v. Klutznick*.  As the *Fullilove* Court explained, the legislative history of the Public Works Act overlapped significantly with the legislative history of Section 8(a). *Fullilove*, 448 U.S. at 460.  The Supreme Court examined the legislative history of Section 8(a) in detail, as well as similar history concerning the construction industry.  *Id.* at 463-67. The Court found:

> Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of private discrimination. . . . Congress had before it, among other data, evidence of a long history of a marked disparity in the percentage of public contracts awarded to minority business enterprises.  This disparity was considered to result not from any lack of capable and qualified minority businesses, but from the existence and maintenance of barriers to competitive access which had their roots in racial and ethnic discrimination and continue today, even

> absent any intentional discrimination or other unlawful
> conduct.  Although much of this history related to the
> experience of minority businesses in the areas of federal
> procurement, there was direct evidence before the Congress
> that this pattern of disadvantage and discrimination existed
> with respect to state and local construction contracting as
> well.  In relation to the MBE provision, Congress acted
> within its competence to determine that the problem was
> national in scope.

*Fullilove*, 448 U.S. at 477-78.[12]

More recently, in 2005, the Ninth Circuit reviewed the
legislative history of the Transportation Equity Act for the 21st
Century ("TEA-21"), which was enacted in 1998.  *W. States*, 407
F.3d at 991-93.  The *Western States* court listed evidence before
Congress in 1998 which was extremely similar, in kind, to the
evidence before Congress when Section 8(a) was enacted in 1978.
Specifically, the court considered statistical and anecdotal
disparities between (1) minority population and minority business
ownership in the United States; (2) majority and minority
business receipts nationwide; and (3) minority business share and
minority percentage of federal contracting dollars throughout the

---

[12] *Fullilove* did not fully articulate the standard of review
it had used, leaving some uncertainty as to whether strict or
intermediate scrutiny applied to remedial race-conscious
legislation.  In *Adarand III*, the Supreme Court announced the
strict scrutiny standard of review, casting doubt on the analysis
and result in *Fullilove* to the extent that it rested on
intermediate scrutiny.  *Fullilove*'s factual findings regarding
discrimination in minority contracting, however, have not been
disturbed.  *See Adarand VII*, 228 F.3d at 1175, n.17; *see also
Croson*, 488 U.S. at 488 (focusing on *Fullilove*'s factual
findings); *Rothe III*, 262 F.3d at 1321 n.14 (Congress's fact
finding process is generally entitled to a presumption of
regularity and deferential review).

economy.  *Id.* at 992.   The *Western States* court also considered
nationwide barriers to minority entry and minority business
development, such as lending discrimination and discrimination by
prime contractors, customers, and suppliers.   *Id.*   The court
found that this evidence, "considered at the time of TEA-21's
enactment," was sufficient to show that "Congress had a strong
basis in evidence" for enacting the nationwide race-conscious
provisions of the statute.   *Id.* 993.

As discussed above, Congress examined extensive evidence
before enacting Section 8(a) through hearings, reports, raw data,
statistical studies, and witness testimony.   The evidence before
Congress includes extensive statistical analysis, qualitative and
quantitative consideration of the unique challenges facing
minority small businesses (as distinguished from the challenges
facing all small businesses), and examination of the race-neutral
measures that had been enacted by previous Congresses but had
failed to reach minority owned firms.   This evidence was
described in *Fullilove* as an "abundant" basis on which to find
discriminatory barriers to market entry and fair competition
existed, and, moreover, impacted federal contracting in the
construction industry and beyond.   It is also very similar in
kind to the evidence presented in *Western States*, which the Ninth
Circuit found to be a "strong basis in evidence" sufficient to
establish a compelling interest in nationwide race-conscious

legislation.  The Court finds that the evidence before Congress when it enacted Section 8(a) satisfies the government's initial burden to demonstrate a compelling interest.  Specifically, the Court finds that Congress had a strong basis in evidence to conclude that action was necessary to remediate discrimination against minority business enterprises when it enacted Section 8(a).  The Court therefore turns to the evidence before Congress since that time to determine whether the government has met its burden to show a continuing compelling need for the program.

Based on the record in this case, the Court concludes that Congress has "spent decades compiling evidence of race discrimination" in a variety of industries, including but not limited to construction.  *Sherbrooke*, 345 F.3d at 970.  The record contains extensive statistical and anecdotal evidence of specific discriminatory barriers to market entry and fair competition, evidence that discrimination and its lingering effects (1) raised barriers to minority business formation and development that precluded minority-owned businesses at the outset from competing for government contracts, and (2) impeded existing minority-owned businesses' ability to obtain government contracts.  Additionally, the record contains substantial quantitative evidence of broad gaps between minority and non-minority contract awards in both public and private sector contracting.  These studies reveal wide disparities, around the

country, in the construction industry and others, even when controlling for other factors such as capacity and eligibility.[13] *Croson* and *Adarand III* hold that significant disparities between the availability and utilization of eligible, qualified minority businesses is sufficient for "an inference of discriminatory exclusion" to arise, which provides the necessary basis for the government to use race-conscious measures in response. *Croson*, 488 U.S. at 509. The government has presented this evidence here. While the government's evidence is most copious in the construction industry, it has also produced significant evidence in professional services, architecture and engineering, and other industries. The government has therefore established that there are at least some circumstances where it would be "necessary or appropriate" for the SBA to award contracts to businesses under the Section 8(a) program. 15 U.S.C. § 637(a)(1); *see also Salerno*, 481 U.S. at 745. Accordingly, the Court concludes that,

---

[13] The Court finds that the evidence from around the country is sufficient for Congress to authorize a nationwide remedy. Defendants point out, and DynaLantic does not dispute, that "in contrast to race-conscious municipal programs, '[t]he geographic scope of Congress's reach . . . is 'society-wide' and therefore nationwide.'" Defs.' MSJ at 12 (quoting *Adarand VII*, 228 F.3d at 1147). "Congress [has] a 'broader brush' than municipalities for remedying discrimination. . . . [W]e do not think that Congress needs to have evidence before it of discrimination in all fifty states in order to justify [a nationwide program]. . . . Contrarily, evidence of a few isolated instances of discrimination would be insufficient to uphold the nationwide program." *Rothe III*, 262 F.3d at 1329-30.

in response to Plaintiff's facial challenge, the government has
met its initial burden to present "a 'strong basis in evidence'
sufficient to support its articulated, constitutionally valid,
compelling interest." *Adarand VII*, 228 F.3d 1174-75.

### b)  Plaintiff's Rebuttal

Because Defendants have made their initial showing of a
compelling interest, the burden shifts to the Plaintiff to show
why the evidence relied on by Defendants fails to demonstrate a
compelling governmental interest. *See Concrete Works IV*, 321
F.3d at 959.  In order to prevail on its facial challenge,
Plaintiff must show that Congress does not have a strong basis in
evidence to conclude that the SBA would find it "necessary or
appropriate" to award Section 8(a) contracts under any
circumstances.  DynaLantic attempts to rebut Defendants' showing
of a compelling interest in a number of ways.  Broadly speaking,
these challenges are that (1) the legislative history is
insufficient, (2) there is no evidence of discrimination by the
federal government, therefore the Section 8(a) program improperly
attempts to remedy societal discrimination, (3) the evidence is
flawed, (4) evidence of fraud in race-conscious programs renders
the challenged programs invalid, and (5) there is insufficient
evidence of discrimination as to each minority group.

### (1)  Sufficiency of Legislative History

First, DynaLantic argues that the legislative history of the Section 8(a) program does not support a finding of a compelling interest.  DynaLantic claims "there was little serious debate surrounding the use of set-asides," and the evidence Congress considered was inadequate as a matter of fact to support a compelling interest under *Croson* and *Adarand*.  Pl.'s Opp'n to Defs.' MSJ at 38.

The Court disagrees that Congress had insufficient evidence to adopt Section 8(a) in 1978.  As set forth above, when Congress considered Section 8(a) it had before it not only the legislative history of that statute, but also the legislative history of the MBE set-aside provision in the Public Works Employment Act of 1977.  *Fullilove*, 448 U.S. at 502 ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area.") (Powell, J., concurring).  As explained above, the Supreme Court considered the legislative history of Section 8(a) and the Public Works Employment Act, and found it contained "abundant evidence" to justify remedial race-conscious measures in the construction industry and indeed in federal contracting as a whole.  *Fullilove*, 502 U.S. at 477-78.  Significantly, Plaintiff acknowledges the additional legislative history in

80

*Fullilove*, but argues that case should be "limited to its facts," *i.e.*, the construction industry. Pl.'s Opp'n to Defs.' MSJ at 41-42. However, in order to succeed on its facial challenge, DynaLantic must prove there is no set of circumstances under which Section 8(a) would be constitutional. Therefore, the facts in the legislative history at issue in *Fullilove* are precisely what is relevant in the instant case. Based on the evidence before Congress with respect to both the Public Works Employment Act of 1977, and, a year later, the heavily overlapping legislative history of Section 8(a), the Court concludes that Congress had a strong basis in evidence to conclude the use of race-conscious measures was necessary in, at least, some circumstances.

The Court also rejects Plaintiff's argument that the type of legislative history compiled by Congress when it enacted Section 8(a) is legally insufficient in a post-*Croson*, post-*Adarand* world. Pl.'s MSJ at 40. As discussed above, in a 2005 case, the Ninth Circuit catalogued the legislative history of TEA-21, which appears very similar to the legislative history of Section 8(a) in terms of the type of evidence produced. *See W. States*, 407 F.3d at 991-93. *Western States* considered the legislative history in light of *Croson* and *Adarand III* and found it constituted a strong basis in evidence. *Id.*

### (2)  Evidence of Government Discrimination

Second, DynaLantic argues in rebuttal that the record contains no evidence of discrimination by the federal government, and therefore the Section 8(a) program improperly attempts to remedy societal discrimination.  Plaintiff claims that there is no allegation that the government discriminated with regard to any barriers to minority business formation or development such as bonding or lending discrimination.  Pl.'s Opp'n to Defs.' MSJ at 42-49.  Plaintiff further maintains that Defendants have not identified any nexus between the federal government and race discrimination in contracting itself.  According to DynaLantic, to show a compelling interest, the government must provide evidence of direct race discrimination in contracting by federal, state or local governments, or at the very least, evidence that private industries directly used federal funds to discriminate.  *See, e.g.*, Pl.'s Reply in Supp. of its MSJ at 11-14.  Plaintiff acknowledges that the government's theory for implementing race-conscious measures is based on its passive participation in discrimination in the private sector.  However, Plaintiff claims that without evidence of government discrimination, or at least evidence that the government has intentionally collaborated with private entities which it knows engaged in discrimination, it cannot show passive participation.  *Id.*

82

DynaLantic's definition of passive participation is wrong as a matter of law.  While the Supreme Court did, at one time, appear to condition race-conscious measures upon a showing of prior discrimination by the government itself, *see Wygant*, 476 U.S. at 274, that requirement was rejected in *Croson*.  The Supreme Court explained that a governmental entity:

> [H]as legislative authority over its procurement policies, and can use its spending powers to remedy private discrimination . . . . Thus, if the City could show that it has essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, we think it clear that the city could take affirmative steps to dismantle such a system.  It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice.

488 U.S. at 492.  This Circuit has adopted the same test.  *See O'Donnell*, 963 F.2d at 425 (governmental entities "may take remedial action when they possess evidence [that] their own spending practices are exacerbating a pattern of prior discrimination, . . . *public or private*" (quoting *Croson*, 488 U.S. at 504))(emphasis added).

Subsequent to *Croson*, the Tenth Circuit, after considering extensive evidence of private discrimination, held that those materials were not merely evidence of generalized societal discrimination, but instead constituted evidence of specific discriminatory barriers to market entry and fair competition facing potential and actual minority entrepreneurs.  *Adarand VII*,

83

228 F.3d at 1167-75.  The court then concluded that such evidence establishes a "strong link" between the government's disbursement of funds for public contracts and the channeling of those funds due to private discrimination.  *See id.* at 1167-68 (explaining that barriers to formation preclude "from the outset" competition for public contracts by minority enterprises, explaining further that barriers to development preclude "existing minority firms from effectively competing" for public contracts); *accord Sherbrooke*, 345 F.3d at 970; *Concrete Works IV*, 321 F.3d at 977.[14]

This Court agrees with *Croson* and its progeny that the government may properly be deemed a "passive participant" when it fails to adjust its procurement practices to account for the effects of identified private discrimination on the availability and utilization of minority-owned businesses in government contracting.  *See Adarand VII*, 228 F.3d at 1165 ("[W]e readily conclude that the federal government has a compelling interest in not perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of

---

[14]   So far as this Court is aware, the Seventh Circuit is the only circuit to adopt a more rigid standard. *See Builders Ass'n v. County of Cook*, 256 F.3d 642, 645 (7th Cir. 2001) (indicating that the concept of "passive participation" should be limited to situations where a government unit might be deemed "a kind of joint tortfeasor, coconspirator, or aider and abettor").  This standard has not been adopted by either this Circuit or the Supreme Court.

past discrimination in the government contracting markets created by its disbursements."); *Sherbrooke*, 345 F.3d at 969.  Moreover, as discussed above, the Court concludes that Congress did identify discriminatory disparities in government contracting. Specifically, the government compiled substantial evidence of identified private racial discrimination which affected minority utilization in specific industries of government contracting, both before and after the enactment of the Section 8(a) program. Accordingly, DynaLantic's argument fails.

### (3)   Flaws in the Evidence

DynaLantic raises several related arguments with respect to the quality of the evidence before Congress.  First, Plaintiff complains that Defendants have not conducted an independent investigation into the truthfulness or accuracy of the documents identified as providing their strong basis in evidence.  Second, Plaintiff points out that all of the evidence does not necessarily support findings of discrimination.  Finally, Plaintiff alleges the disparity studies are flawed.  Upon consideration, the Court finds that any flaws DynaLantic has identified in the data do not rise to the level of "credible, particularized evidence" necessary "to rebut the government's initial showing of a compelling interest."  *Adarand VII*, 228 F.3d at 1175.

The proponent of a race-conscious remedial program is "not required to unequivocally establish the existence of discrimination[,] nor [is] it required to negate all evidence of non-discrimination." *Concrete Works IV*, 321 F.3d at 991 (internal quotation marks omitted). Rather, a "strong basis in evidence" exists when there is evidence "'approaching a *prima facie* case of a constitutional or statutory violation,' *not* irrefutable or definitive proof of discrimination." *Id*. at 971 (quoting *Croson*, 488 U.S. at 500); *see also O'Donnell*, 963 F.2d at 424 (race-conscious "legislation must rest on evidence at least approaching a prima facie case of racial discrimination in the relevant industry"). Accordingly, DynaLantic's claim that the government must independently verify the evidence presented to it is unavailing. Likewise, the government may act to remedy discrimination when there is a "strong basis" in evidence from which an inference of discrimination could arise. *Croson*, 488 U.S. at 510. The complete absence of evidence suggesting a contrary result is not required.

Plaintiff also argues that the disparity studies before the Court are inadequate. In earlier briefing before the Court, DynaLantic examined several of the studies relied upon by Defendants. Plaintiff did not, however, undertake this task in the parties' most recent submissions to the Court. In 2009, Defendants placed into the record approximately 50 disparity

studies which had been introduced or discussed in Congressional hearings since 2006.  DynaLantic did not rebut or even discuss any of those studies individually.  *See generally* Pl.'s Mem. on Evidence Presented to Congress After Jan. 4, 2006; Pl.'s Reply Br. on Evidence Presented to Congress After Jan. 4, 2006.  Rather, DynaLantic asserted generally that the studies did not control for the capacity of the firms at issue, and were therefore unreliable.  *See* Pl.'s Mem. on Evidence Presented to Congress After Jan. 4, 2006 at 3-7.[15]

As set forth in Section III.C.2.c above, DynaLantic's arguments are incorrect as a matter of fact.  While not all of the disparity studies accounted for the capacity of the firms, many of them did control for capacity and still found significant disparities between minority and non-minority owned firms.  DynaLantic disputes the methodology of Jon Wainwright, a social scientist identified by Defendants, who authored some of the studies submitted to Congress.  Dr. Wainwright argues that capacity measurements are unreliable because "most, if not all, identifiable indicators of capacity are themselves impacted by

---

[15] DynaLantic also asserted that the studies are "irrelevant" because they "are not nationwide in scope[.]" *Id.* at 9.  However, as discussed above in Section III.D.1.a, Congress need not have evidence of discrimination in all 50 states to demonstrate a compelling interest.  *Rothe III*, 262 F.3d at 1329. In this case, Defendants have presented recent evidence of discrimination in a significant number of states and localities which, taken together, represent a broad cross-section of the nation.

discrimination." Defs.' Supplemental Br. on Evidence Presented to Congress After Jan. 4, 2006 at 10; *see also* Pl.'s Mem. on Evidence Presented to Congress After Jan. 4, 2006 at 5-7. However, while Plaintiff disputes the validity of Dr. Wainwright's methods, it does not discuss his more recent studies, nor does it demonstrate the disparities shown in those studies are eliminated when there is a control for firm capacity. *See Concrete Works IV*, 321 F.3d at 983 (finding criticism of Denver's disparity studies insufficient for same reason). In short, DynaLantic's "general criticism" of the multitude of disparity studies introduced by the Defendants after 2006 does not constitute "particular evidence undermining the reliability of the particular disparity studies" and, therefore, "is of little persuasive value." *Adarand III*, 228 F.3d at 1173 n.14; *see also Sherbrooke*, 345 F.3d at 970 ("In rebuttal, [plaintiffs] presented evidence that the data was susceptible to multiple interpretations, but they failed to present affirmative evidence that no remedial action was necessary because minority-owned small businesses enjoy non-discriminatory access to and participation in highway contracts. Thus, they failed to meet their ultimate burden to prove that the DBE program is unconstitutional on this ground.").

### (4)  Fraud in the Administration of Race-Conscious Programs

Plaintiff claims that Defendants' evidence is flawed and unreliable because, Plaintiff alleges, fraud pervades race-conscious programs.  Regardless of the program at issue, Plaintiff argues, "[a]ll major set-aside efforts have been tainted significantly by fraud."  Pl.'s Opp'n to Defs.' MSJ at 25 (internal citation omitted).  Plaintiff asserts that the existence of fraud demonstrates that the data Defendants cite to defend their use of race is fatally flawed, cannot be used to establish any discrimination, and undermines their evidence of the alleged compelling interest.  *Id.* at 24-32.  Defendants, for their part, argue that while the Section 8(a) program may have had problems with fraud in the past, those problems have been largely corrected since the late 1990s.  *See* Defs.' Reply in Supp. of its MSJ at 15-17.  More fundamentally, Defendants argue that a prior misapplication of the program is not grounds for declaring the program unconstitutional.  If Plaintiff has any evidence that undeserving individuals are improperly benefitting from the Section 8(a) program today, its recourse is to bring those facts to the attention of the appropriate government officials so that corrective action can be taken.  *See* 13 C.F.R. § 124.103(b)(3).

Defendants have the better argument here.  Although the history of abuse of federal programs is alarming, DynaLantic has

cited no authority in support of its claim that such abuse is sufficient to invalidate a statute on its face.  Moreover, the vast majority of evidence relied upon by Defendants to show a compelling interest is not based on data from Section 8(a) program participants.  The statistical and anecdotal evidence regarding discriminatory barriers to minority business formation and development, and the resulting disparities in government contracting, is largely drawn from state and local governments and from the private sector.  The identity of Section 8(a) participants, and their status as bona fide socially and economically disadvantaged individuals – or not - does not undermine the reliability of those studies.

> **(5)  Evidence of Discrimination Against Each Minority Group**

DynaLantic argues that the government did not have a compelling interest to find that "each of the preferred groups" had suffered discrimination and therefore should be included in the rebuttable presumption of social disadvantage.  Pl.'s MSJ at 44-46; *see also* Pl.'s Reply at 20.[16]  DynaLantic maintains that the government must show it had evidence of discrimination against not only all of the five broad groups racial groups

---

[16]  As discussed below in Section III.E, DynaLantic raises a similar claim in arguing that the 8(a) program is not narrowly tailored; specifically, it claims the program is overinclusive because it includes groups which have not suffered discrimination.

identified in the statute and accompanying regulation, but the
thirty-seven racial subgroups as well.  Pl.'s MSJ at 48-50; *see
also* 15 U.S.C. § 631(f)(1); 13 C.F.R. § 124.103.  Defendants
respond that Congress need not reach this level of specificity;
evidence of racial discrimination among the five broad groups is
sufficient.  Defs.' Opp'n at 27-29.  The Court agrees with
Defendants, as well as at least two circuits which have
considered the identical issue, that Congress has a strong basis
in evidence if it finds "evidence of discrimination is
sufficiently pervasive across racial lines to justify granting a
preference to all five purportedly disadvantaged groups included"
in Section 8(a).  *Rothe III*, 262 F.3d at 1330; *see also Adarand
VII*, 228 F.3d at 1176 n.18; *see also id.* at 1185-86 ("'Race' is
often a classification of dubious validity - scientifically,
legally, and morally.  We do not impart excess legitimacy to
racial classifications by taking note of the harsh fact that
racial discrimination commonly occurs along the lines of the
broad categories identified: Black Americans, Hispanic Americans,
Native Americans, Asian Pacific Americans and other minorities."
(internal quotations omitted)).   Based on the evidence
discussed at length above, the Court finds that Congress had
strong evidence "that the discrimination is sufficiently
pervasive across racial lines to justify granting a preference to
all five" groups included in Section 8(a).  *Rothe III*, 262 F.3d

at 1329.  Specifically, the Court concludes that the record
reveals specific, persuasive evidence from which a reasonable
inference of discrimination could be made against each of the
minority groups at issue.  Equally persuasive to the Court, the
evidence reveals that across the nation, public and private
contracting markets are "overwhelmingly composed of non-
minorities due to the effects of racial discrimination." *Adarand
VII*, 228 F.3d at 1176 n. 18.  In light of the evidence of
"pervasive discrimination across racial lines," the fact that
specific evidence varies, to some extent, within and between
minority groups, is not a basis to declare the statute facially
invalid.  *Id.; see also Concrete Works IV*, 321 F.3d at 971.  This
case is therefore distinguishable from *Croson*, where the
legislation at issue contained "random inclusion of racial
groups" for whom there was no evidence of residency in the
jurisdiction, let alone of discrimination in the relevant
industry.  488 U.S. at 506.

### c)   Facial Challenge: Conclusion

For the foregoing reasons, the Court concludes that Congress
has a compelling interest in eliminating the roots of racial
discrimination in federal contracting, funded by federal money.
The Court further concludes that the government has established a
strong basis in evidence to support its conclusion that remedial
action was necessary to remedy that discrimination by providing

significant evidence in three different areas.  First, it provided extensive evidence of discriminatory barriers to minority business formation, which stifles, from the outset, minority competition for federal contracts.  Second, it provided forceful evidence of discriminatory barriers to minority business development, which also impairs minority competition for federal contracts.  Third, it provided significant evidence that, even when minority businesses are qualified and eligible to perform contracts in both the public and private sectors, they are awarded these contracts far less often than their similarly situated non-minority counterparts.  The evidence considered by this Court is particularly strong, nationwide, in the construction industry; however, the government has provided substantial evidence of widespread disparities in other industries such as architecture and engineering, and professional services as well.

In order to rebut the government's showing, DynaLantic had to present credible, particularized evidence that undermined the government's compelling interest and demonstrated that the government's evidence "did not support an inference of prior discrimination and thus a remedial purpose." *Wygant*, 476 U.S. at 293 (O'Connor, J., concurring).  It failed to do so.

As discussed throughout, Section 8(a) does not mandate race-conscious set-asides at any time.  Rather, the statute instructs

the SBA to enter into contracts with socially and economically disadvantaged business only when the SBA finds it "necessary or appropriate."  15 U.S.C. § 637(a)(1).  To prevail on its facial challenge, Plaintiff had to show that Congress lacked a strong basis in evidence to conclude that there is any set of circumstances in which it would be necessary or appropriate for the SBA to enter into such contracts.  DynaLantic did not meet its burden under either strict scrutiny or under *Salerno*. Accordingly, DynaLantic's facial challenge to Section 8(a) fails.

### 2.   As-Applied Challenge

As set forth above, Section 8(a) provides Congressional authorization for the SBA to enter into procurement contracts using race-conscious measures when "it determines such action is necessary or appropriate."  15 U.S.C. § 637(a)(1).  In addition to its facial challenge, DynaLantic challenges SBA and DOD's use of the Section 8(a) program as applied: namely, the agencies' determination that it is necessary or appropriate to set aside contracts in the military simulation and training industry.  *See* Second Am. Compl. ¶¶ 13-16, 25, Prayer for Relief.

As noted above, Defendants concede that they do not have evidence of discrimination in this industry.  Indeed, DynaLantic's statement of undisputed facts contains the following statements, which Defendants have admitted:

140. There is no Congressional report, hearing or finding that references, discusses or mentions the simulation and training industry.

141. Defendants are unaware of any discrimination in the simulation and training industry.

142. None of the documents that Defendants have cited as justification for the race-conscious mechanisms in the Section 8(a) . . . Program[] . . . mentions or identifies instances of past or present discrimination in the simulation and training industry[.]

[. . .]

144. DoD is unaware of any disparity study, by anyone, with regard to the simulation and training industry.

Pl.'s Statement of Undisputed Material Facts ¶¶ 140-44 (internal citations omitted); *see also* Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts at 17.  Defendants do not view this lack of evidence as a problem.  Instead, they maintain that as a matter of law, the government need not tie evidence of discriminatory barriers to minority business formation and development to evidence of discrimination in any particular industry.  *See, e.g.*, Defs.' Opp'n at 4, 17-19.  Defendants argue as follows:

> [T]he Section 8(a) program makes no claim to be directed at discrimination within a single industry or location, nor does it seek to achieve a pre-determined level of minority representation in any particular industry category. Instead, the Section 8(a) program takes aim at problems that cut across industries – *i.e.*, discrimination that inhibits the development of certain minority-owned businesses and frustrates their ability to participate on an equal opportunity basis in contracting with the federal government.  Whatever sorts of findings might be needed at the industry level to uphold a Congressional measure designed to attain a certain level of minority-owned

> business participation in one industry, the Constitution does not require findings of that sort to find a compelling governmental interest for the Section 8(a) Program.

Defs.' Opp'n at 18.  Upon careful consideration, the Court concludes that Defendants' position is irreconcilable with binding authority upon this Court, specifically, the Supreme Court's decision in *Croson*, as well as this Circuit's decision in *O'Donnell Construction Company*, which adopted *Croson*'s reasoning. As discussed in Section III.C.2.c above, *Croson* made clear that the government must provide evidence demonstrating there were *eligible minorities in the relevant market* – in that case, the Richmond construction industry – that were denied entry or access notwithstanding their eligibility.  *See* 488 U.S. at 502; *see also O'Donnell*, 963 F.2d at 427.  *Croson* and *O'Donnell* held that absent such evidence, the government is left with unexplained disparities, which are insufficient to create an "inference of discriminatory exclusion," and therefore insufficient to demonstrate a compelling interest.  *Croson*, 488 U.S. at 498-508; *see also O'Donnell*, 950 F.2d at 424-27.

The government attempts to distinguish *Croson* on a number of grounds, none of which is persuasive.  First, the government points to the existence of a "rigid quota" in Richmond as opposed to Section 8(a)'s "reasonable aspirational goal."  Defs.' Opp'n at 14.  Defendants fail to recognize, however, that the Supreme Court explicitly adopted the *Croson* standards in *Adarand III*, a

96

case involving race-based "goals" as opposed to "quotas."  515 U.S. at 205, 223-27.  Second, Defendants claim *Croson* is inapplicable because the Richmond ordinance mandated "reflexive or stereotypical reliance on race" alone, while the Section 8(a) program requires individual consideration of economic disadvantage in addition to race.  Defs.' Opp'n at 13-14.  Again, Defendants do not acknowledge that, at least so far as this Court is aware, every court to consider the issue has applied *Croson*'s reasoning to programs which, like the 8(a) program, require both social and economic disadvantage to qualify.  *See, e.g.*, *Adarand VII*, 228 F.3d at 1163-66; *Sherbrooke*, 345 F.3d at 969; *Western States,* 407 F.3d at 991-93; *N. Contracting, Inc. v. Illinois*, Case No. 00-C-4515, 2004 U.S. Dist. LEXIS 3226, *89-101 (N.D. Ill. Mar. 3, 2004).

Finally, the government attempts to distinguish *Croson* by claiming that its purpose in the Section 8(a) program is different.  Specifically, the government argues that its interest is "not to channel disadvantaged businesses into particular industries at particular locations, but instead to enable disadvantaged individuals to overcome racial discrimination in business development and equal opportunity in whatever industry they choose to enter."  Defs.' Opp'n at 19.  This is not, however, a difference in the fundamental *nature* of the 8(a) program; it is a difference in the *scope* of the 8(a) program.

Essentially, the government maintains that discrimination in business formation and growth exist throughout the economy.  The government may well be correct.  However, absent an evidentiary showing that, in a highly skilled industry such as the military simulation and training industry, there are eligible minorities who are "qualified to undertake [] particular task[s]" and are nevertheless denied the opportunity to thrive there, the government cannot comply with *Croson*'s evidentiary requirement to show an inference of discrimination.  *See Croson*, 488 U.S. at 501.  As this Circuit has held, the government "cannot simply rely on broad expressions of purpose or general allegations of historical or societal racism.  Rather, its legislation must rest on evidence at least approaching a *prima facie* case of discrimination in the relevant industr[ies]." *O'Donnell*, 963 F.2d at 424.  Excusing the federal government from this requirement would permit the federal government to implement race-conscious preferences using a different standard of proof than state and local governments, a result which has been squarely rejected by the Supreme Court in *Adarand III.*  515 U.S. at 224, 226-27.

The government states that it does not have to make an industry-based showing in order to show strong evidence of discrimination.  However, Defendants have not explained how else they would meet *Croson*'s requirement to show that minority

businesses are ready, able and willing to perform in the relevant marketplace, however that is defined.[17]  Of utmost importance, the government has not identified legal authority to support its theory.  To the contrary, as another judge on this court has observed, the same Department of Justice that represents Defendants has recognized that the federal government must take an industry-based approach to demonstrating compelling interest. In *Cortez III Service Corp. v. National Aeronautics & Space Administration*, the Honorable Stanley Sporkin found the Section 8(a) program constitutional on its face because there was evidence before Congress of racial discrimination impacting government contracting and "there is a compelling government interest in combating such discrimination where it exists."  950 F. Supp. 357, 361 (D.D.C. 1996).  However, he found the program unconstitutional as applied to the NASA contract at issue because the government had provided no evidence of discrimination in the industry in which the NASA contract would be performed.  Judge Sporkin held:

---

[17]  The Court recognizes that the pieces of legislation considered in *Croson*, *Adarand III*, and *O'Donnell* were all explicitly restricted to one industry.  This case presents a different factual scenario, because Section 8(a) is not industry-specific.  However, the government has not proposed an alternative framework to *Croson* within which the Court can analyze the evidence.  In fact, a significant portion of the evidence the government presents in this case is industry specific.  *See supra* Section III.C.2.c.  This Court therefore is constrained to follow the binding precedent of *Croson*, *Adarand III*, and *O'Donnell*.

> The fact that Section 8(a) is constitutional on its face,
> however, does not give the SBA, NASA, or any other
> government agency carte blanche to apply it without
> reference to the limits of strict scrutiny.  Rather,
> agencies have a responsibility to decide if there has been a
> history of discrimination in the particular industry at
> issue. . . . [I]t is not inconsistent with Congress's
> mandate to the SBA, to require the SBA to ensure that in
> each context where an 8(a) set-aside is proposed, such a
> set-aside is actually required.

*Id.* at 361.  Judge Sporkin noted that the Department of Justice

had advised federal agencies to make industry-specific

determinations before offering set-aside contracts and

specifically cautioned them that without such particularized

evidence, set-aside programs may not survive *Croson* and *Adarand*.

*Id.* at 361-62 (*citing* Proposed Reforms to Affirmative Action in

Federal Procurement, 61 Fed. Reg. 26042 (1996); Walter Dellinger,

Office of Legal Counsel, U.S. Department of Justice, *Memorandum

to General Counsels* (June 28, 1995) (hereinafter, "DOJ

Memorandum").[18]  The government has not meaningfully

distinguished *Cortez III* from this case.

A reviewing court need not take a party's definition of

"industry" at face value, and may determine the appropriate

---

[18]  Specifically, DoJ advised that to survive *Adarand III*,
evidence supporting the use of set asides needed to be grounded
in "statistics" that are "sophisticated and focused."  DOJ
Memorandum, App. A ("a statistical underrepresentation of
minorities in a sector or industry . . . without more, [is] an
impermissible bas[i]s for affirmative action.")  It advised
agencies to seek evidence that "attempt[s] to identify the number
of qualified minorities in the sector or industry or seek[s] to
explain what that number would look like 'but for' the
exclusionary effects of discrimination."  *Id.*

industry to consider is broader or narrower than that proposed by
the parties.  *See Rothe III*, 262 F.3d at 1330 (district court may
define the relevant industry more broadly as "business services"
instead of the narrower "computer maintenance and repair services
in the defense industry," as urged by plaintiff).  However, in
this case, the government did not argue with Plaintiff's industry
definition - military simulation and training - and did not
propose another.  More significantly, it provided no evidence
whatsoever from which an inference of discrimination in that
industry could be made.

"Without question, there is a compelling government interest
in combating [] discrimination where it exists."  *Cortez III*, 950
F. Supp. at 361.  On this record, however, the Court is unable to
conclude that Defendants have produced evidence of discrimination
in the military simulation and training industry.  Accordingly,
because the government has not met its burden to show a
compelling interest in remedying discrimination in the military
simulation and training industry, DynaLantic prevails on its as-
applied challenge.

Having concluded that DynaLantic prevails on its as-applied
challenge, the Court need not consider whether the Section 8(a)
program is narrowly tailored, as applied to the military
simulation and training industry.  However, having concluded
above that Section 8(a) has a strong basis in evidence to further

101

its compelling interest on its face, the Court must still determine whether it is narrowly tailored to survive a facial challenge.

### E.  Narrow Tailoring

In addition to showing strong evidence that a race-conscious program serves a compelling interest, the government must show that "the means chosen to accomplish the government's asserted purpose [are] specifically and narrowly framed to accomplish that purpose." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (citations omitted).  "An affirmative action plan is narrowly tailored if, as a practical matter it discriminates against whites as little as possible consistent with effective remediation." *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000) (citation omitted).  The Court considers several factors in this analysis: (1) the efficacy of alternative, race-neutral remedies, (2) flexibility, (3) over- or under-inclusiveness of the program, (4) duration, (5) the relationship between numerical goals and the relevant labor market, and (6) the impact of the remedy on third parties.  *United States v. Paradise*, 480 U.S. 149, 171, 187 (1987) (plurality and concurring opinions); *see also Croson*, 488 U.S. at 508 (plurality opinion). DynaLantic's facial challenge to the Section 8(a) program requires the Court to look carefully at the regulations "to determine whether they may be constitutionally applied under *any*

102

set of factual circumstances." *Sherbrooke*, 345 F.3d at 971

(citing *Salerno*, 481 U.S. at 746); *accord N. Contracting, Inc. v.

Illinois*, 2004 U.S. Dist. LEXIS 3226, *123.

### 1.  Race-Neutral Means

After a compelling interest has been identified and properly

documented, and before the government undertakes race-conscious

efforts, it first must consider the use of race-neutral means.

*See Adarand III*, 515 U.S. at 237-38 (remanding action to

determine "whether there was 'any consideration of the use of

race-neutral means to increase minority business participation'

in government contracting" (quoting *Croson*, 488 U.S. at 507)).

"Narrow tailoring does not require exhaustion of every

conceivable race-neutral alternative" before implementing race-

conscious measures. *Grutter*, 539 U.S. at 339.  Rather, narrow

tailoring requires "serious, good faith consideration of workable

race neutral alternatives." *Id.*

As Defendants point out, Congress attempted to use race-

neutral measures to foster and assist minority owned business for

at least twenty-five years prior to incorporating a race-

conscious component in Section 8(a), and these race-neutral

measures failed to remedy the effects of discrimination on

minority small business owners.  Beginning with the Small

Business Act of 1953, Congress authorized various programs to

"aid, counsel, assist, and protect . . . the interests of

small-business concerns" and to "insure that a fair proportion of the total purchases and contracts for supplies and services for the government be placed with small-business enterprises . . . ." Pub. L. No. 83-163, § 202, 67 Stat. 232 (1953). The race-neutral measures employed by Congress between 1953 and 1978 included creation of a surety bond guarantee program, creation of a new class of small business investment companies to provide debt and equity capital, improvement of disaster assistance, loans to small businesses, small business development centers, and, notably, race-neutral small business set-asides. *See, e.g.*, Defs.' MSJ at 31-33. Accordingly, Defendants argue that when Congress considered the race-conscious provisions of Section 8(a), it had before it evidence of continuing discriminatory barriers to minority businesses notwithstanding all of the race-neutral measures it had already enacted. *See Adarand VII*, 228 F.3d at 1178 ("The long history of discrimination in, and affecting the public construction procurement market - despite efforts dating back at least to the enactment in 1958 [sic] of the SBA to employ race-neutral measures . . . justifies race-conscious action . . . .").

DynaLantic's claims that no race-neutral alternatives were considered are based on Defendants' admission, during discovery, that (1) no other alternative to race has ever been used in the Section 8(a) program; (2) neither Congress nor the SBA considered

the operation of non-race-conscious alternatives, such as
anti-discrimination laws, before establishing the race-conscious
requirements in the Section 8(a) program; and (3) the SBA also
has not used other, race-neutral means to address alleged
discrimination against minority contractors (or similar problems
for non-minorities), such as any different standards regarding
start-up costs, bonding costs, or other criteria for emerging
businesses.  Pl.'s MSJ at 51-52.  As Defendants correctly point
out, however, these admissions are taken out of context and do
not undermine their evidence that the government considered race-
neutral means.  *See* Defs.' Opp'n at 33-35.  Accordingly, the
Court concludes that Defendants' admissions do not support
DynaLantic's claims.

The admissions at issue arise from Defendants' answers
during discovery about a document prepared by the SBA to provide
information about the Section 8(a) program following the Supreme
Court's 1995 decision in *Adarand III*.  *See* Pl.'s MSJ, Ex. B49,
*U.S. Small Business Administration Management of the 8(a)
Program: Narrow Tailoring* (hereinafter "8(a) Document").  The
8(a) Document uses a question-and-answer format.  In response to
the question "[d]id Congress or the agency consider the operation
of non-race-conscious alternatives . . . before establishing the
race-conscious requirement," the SBA answered "No."  *Id.* at 4.
Defendants assert that this answer is only correct insofar as the

Section 8(a) program itself is concerned.  In other words, they explain that the answer means simply that the Section 8(a) program, as codified by Congress and implemented by the SBA, has always contained a race-conscious element.  *See* Defs.' Opp'n, Ex. 1, First Declaration of Darryl K. Hairston ("Hairston Decl. 1") ¶ 4.

As Defendants note, the portion of the 8(a) Document on which Plaintiff's argument depends was not intended to address the race-neutral alternatives which were utilized prior to the codification of the Section 8(a) program.  To the contrary, the 8(a) Document itself, on the two pages immediately following the question and answer on which Plaintiff relies, references some of those race-neutral alternatives, including surety bond guarantees, loan guarantees, and counseling and training.  *See* Pl.'s MSJ, Ex. B49 at 5-6; *see also, e.g.*, Pub. L. No. 91-609, 84 Stat. 1813 (1970) (surety bond guarantee program); Pub. L. No. 83-163, §§ 207(a) & (e), 67 Stat. 235-36 (1953) (loans and loan guarantees; counseling and training).

The Court agrees with Defendants that the 8(a) Document, when read in context, does not support Plaintiff's claims. Congress adopted a race-conscious contracting preference for the Section 8(a) program only after long experience showed that race-neutral alternatives were inadequate to combat the effects of racial discrimination against minority-owned businesses.  As

106

discussed at length in Sections III.C and III.D above, the Court further concludes that recent evidence indicates minority business developments remain hampered by the same kinds of discriminatory barriers that prompted the enactment of the Section 8(a) program.  Specifically, many of the recent disparity studies before Congress indicate that in the absence of race-conscious measures, discrimination against qualified minority contractors in a variety of industries is far more pronounced. *See supra* Section III.C; *see also Adarand VII*, 228 F.3d at 1174 ("There is ample evidence that when race-conscious public contracting programs are struck down or discontinued, minority participation in the relevant market drops sharply or even disappears.").

### 2.   Flexibility

The Court next considers whether the Section 8(a) program is sufficiently flexible in granting race-conscious relief.  A rigid racial quota system such as the one invalidated in *Croson* or *O'Donnell* "is the hallmark of an inflexible affirmative action program." *W. States*, 407 F.3d at 994.  The Section 8(a) program, by contrast, contains no quotas at all; it provides for aspirational goals and imposes no penalties for failing to meet them.  Nevertheless, DynaLantic claims that the Section 8(a) program is inflexible for two principal reasons: first, it contains a presumption that minorities are socially

107

disadvantaged, and second, it lacks sufficiently effective waiver mechanisms.  Pl.'s MSJ at 54-58.

DynaLantic's claim that the race-based presumption renders the statute inflexible is unpersuasive in light of several decisions which have held similar race-based presumptions pass constitutional muster.  The Eighth and Ninth Circuits, as well as the Northern District of Illinois, have all considered facial challenges to statutes containing a presumption that minorities are socially disadvantaged.  The courts found the statutes narrowly tailored: (1) because the presumption was rebuttable, and (2) because it contained an individualized economic component as well.  *See W. States*, 407 F.3d at 995; *Sherbrooke*, 345 F.3d at 973; *N. Contractors*, 2004 U.S. Dist. LEXIS 3226, at *130.  The Section 8(a) program is similarly flexible.  The presumption that a minority applicant is socially disadvantaged may be rebutted if SBA is presented with credible evidence to the contrary.  13 C.F.R. § 124.103(c).  Likewise, an individual who is not presumptively disadvantaged may qualify for such status if s/he can demonstrate social disadvantage by a preponderance of the evidence.  *Id.*  Finally, the 8(a) program requires an individualized determination of economic disadvantage.  *Id.* § 124.104.  Each applicant must establish economic disadvantage under the standards contained in the regulations, including the submission of a narrative statement describing his or her

economic disadvantage and personal financial information.  *Id.* §
124.104(b).  Individuals whose net worth exceeds $250,000 are not
considered economically disadvantaged for the purposes of entry
into the Section 8(a) program.  *Id.* § 124.104(c)(2).  Because
"race is made relevant in the program, but [] is not a
determinative factor," the Court finds the program is flexible.
*Sherbrooke*, 345 F.3d at 973.

DynaLantic also argues that the Section 8(a) program is not
sufficiently flexible because it does not contain industry based
waivers and waivers for specific minority groups.  Pl.'s MSJ at
55-57.  While the Court agrees that Plaintiff's concerns about
the scope of Section 8(a) warrant careful consideration by the
Court, it finds these arguments misplaced here.  As set forth
above, the Court has carefully considered - and accepted -
Plaintiff's arguments regarding industry in the context of
compelling interest.  And the Court considers Plaintiff's
arguments regarding the scope of minorities included in Section
8(a) twice - above, in the compelling interest analysis, and
below, in considering whether the program is over- or under-
inclusive.  Accordingly, it is unnecessary to consider these
points again here.[19]

_____

[19]  Plaintiff raises the same industry based argument as a
sign that the 8(a) program is impermissibly over-inclusive and
therefore not narrowly tailored.  Again, because the Court found
this issue more appropriately considered and resolved under the
rubric of compelling interest, the Court does not address it

Finally, it is noteworthy that the Section 8(a) program contains a waiver provision "despite the already non-mandatory nature of the [] program[]." *Adarand VII*, 228 F.3d at 1181.  SBA will not accept a procurement for award as an 8(a) contract if it determines that acceptance of the procurement would have an adverse impact on small businesses operating outside the Section 8(a) program.  13 C.F.R. § 124.504.  The waiver is an additional element of flexibility in the 8(a) program.  *See Paradise*, 480 U.S. at 171.

### 3.   Over- and Under-Inclusiveness

DynaLantic argues that the program is both over- and under-inclusive.  *See, e.g.*, Pl.'s MSJ at 46-51; Pl.'s Reply at 20-21.  Plaintiff claims the program is over-inclusive because "virtually every minority group is presumed to be disadvantaged," Pl.'s MSJ at 49, and under-inclusive because it fails to include groups such as women and Hasidic Jews, *see id.* at 50-51.

Plaintiff's over-inclusiveness argument fails for two reasons.  First, as discussed in Section III.D above, the government had strong "evidence of discrimination [which] is sufficiently pervasive across racial lines to justify granting a preference to all five purportedly disadvantaged groups" at issue.  *Rothe III*, 262 F.3d at 1330.  Second, unlike the program found unconstitutional in *Croson*, Section 8(a) does not provide

again here.

that every member of a minority group is disadvantaged.  *See* 488
U.S. at 508 (plurality opinion).  Admittance to the Section 8(a)
program is narrowly tailored because it is based not only on
social disadvantage, but also on an individualized inquiry into
economic disadvantage.  *See Adarand VII*, 228 F.3d at 1184.
Specifically, it is limited to small businesses whose owners have
a personal net worth of less than $250,000.  Any person may
present "credible evidence" challenging an individual's status as
socially or economically disadvantaged.  13 C.F.R. §§
124.103(b)(3), 124.112(c).  Finally, a firm owned by a non-
minority may qualify as socially and economically disadvantaged.
*Id.* § 124.103(d); *see also N. Contractors*, 2004 U.S. Dist. LEXIS
3226, at *137-38 (rejecting over-inclusiveness challenge on
substantially the same grounds).

    The Court is puzzled by Plaintiff's under-inclusiveness
challenge.  Section 8(a) is designed, in relevant part, to remedy
identifiable "racial or ethnic prejudice or cultural bias," not
gender or religious discrimination.  13 C.F.R. § 124.103(a);  15
U.S.C. § 637(a)(5).  Again, however, a firm owned by an
individual in either of these groups may qualify as socially and
economically disadvantaged and thus participate in the Section
8(a) program.

### 4. Duration

The Supreme Court has explained that race-conscious remedies should "not last longer than the discriminatory effects [they are] designed to eliminate." *Adarand III*, 515 U.S. at 238 (citations omitted). Although the Section 8(a) program does not incorporate a specific "sunset" provision applicable to the entire program, it does impose temporal limits on every individual's participation that fulfill the temporal aspect of narrow tailoring. The Tenth Circuit has held that Section 8(a)'s temporal limits survive strict scrutiny in light of the program's focus on the specific social and economic circumstances of individual firms and their owners, not merely their minority status. *Adarand VII*, 228 F.3d at 1179. This Court agrees.

The Section 8(a) program places a number of strict durational limits on a particular firm's participation in the Section 8(a) program. First, participation is limited by statute and regulation to a maximum term of nine years. *See* 13 C.F.R. § 124.2; 15 U.S.C. §§ 636(j)(10)(c), 636(j)(10)(E), 636(j)(10)(H), 636(j)(15). Furthermore, once a business or disadvantaged individual has participated in the Section 8(a) program, neither the business nor that individual will be eligible again. *See* 13 C.F.R. § 124.108(b); 15 U.S.C. §§ 636(j)(11)(B) & (c).

In addition to these temporal limits, a Section 8(a) program participant's eligibility is continually reassessed and must be maintained throughout its program term.  A participant must annually submit a certification that it meets program eligibility requirements, along with financial and other information to permit the SBA to verify its continuing eligibility for the program and to enable the SBA to monitor its performance and progress in business development.  *See* 13 C.F.R. §§ 124.112(b), 124.509(c), 124.601, 124.602; 15 U.S.C. §§ 637(a)(4)(c), 637(a)(6)(B), 637(a)(12)(A), 637(a)(20).  Morever, a participant must leave the program early if the firm has substantially achieved the targets, objectives, and goals set forth in its business plan and has demonstrated the ability to compete in the marketplace without assistance.  13 C.F.R. § 124.302(a).  A participant may also be terminated early for failing to maintain its eligibility.  *Id.* § 124.303(a)(2).

The SBA must conduct an evaluation of a Section 8(a) program participant's eligibility for continued participation whenever it receives specific and credible information alleging that the participant no longer meets the requirements for continued program eligibility.  *See* 13 C.F.R. § 124.112(c); 15 U.S.C. §§ 636(j)(10)(J)(I), 637(a)(6)(c).  Thus, once a program participant overcomes its disadvantaged status, or has been

afforded a reasonable opportunity to do so, its participation in the Section 8(a) program ends.

In short, Section 8(a)'s "inherent time limit and graduation provisions ensure that it . . . is carefully designed to 'endure[] only until . . . the discriminatory impact' has been eliminated; once a DBE loses its economic disadvantage, it loses its certification." *Adarand VII*, 228 F.3d at 1179 (quoting *Paradise*, 480 U.S. at 178).  Accordingly, with regard to appropriate limits on duration, the Section 8(a) program is narrowly tailored.

### 5.  Numerical Proportionality

Plaintiff claims that the Section 8(a) program, as administered by SBA and utilized by DoD, lacks numerical proportionality, *i.e.*, that the aspirational goals established by the government are not reasonably tied to the pool of available minority businesses.  Plaintiff argues that the contract goals for Section 8(a) firms or SDBs - socially and economically disadvantaged businesses - are unrelated to the discrimination suffered by minority groups and, therefore, the program is not narrowly tailored.  Pl.'s MSJ at 53-54; *see also* Pl.'s Opp'n to Defs.' MSJ at 65-69.  Upon consideration of the three aspirational goals at issue in this case, all of which set goals that less than five percent of contract dollars be awarded to firms in the Section 8(a) program, the Court cannot agree.

114

In *Croson*, the Court struck down a 30 percent quota for minority firm contracts in the construction industry as not "narrowly tailored to any goal, except perhaps outright racial balancing.  It rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population."  488 U.S. at 507 (plurality opinion).  The three contracting goals at issue in this case are significantly different from the quota in *Croson.*  First, the Small Business Act establishes government-wide aspirational goals for procurement contracts awarded to, *inter alia*, small businesses, small business concerns owned by women, and small business concerns controlled by socially and economically disadvantaged individuals.  15 U.S.C. § 644(g)(1).  The government-wide goal for small businesses owned by socially and economically disadvantaged individuals is five percent of the value of all prime and subcontract awards annually.  *Id.*  The Section 8(a) program, however, contains only a subset of socially and economically disadvantaged businesses; the term "socially and economically disadvantaged" includes individuals, programs and contract awards apart from, and in addition to, the Section 8(a) program.  *See* Pl.'s MSJ at 12-13; *see also, e.g.*, 15 U.S.C. §§ 637(d)(1), (d)(3)(c) (program to increase subcontracting among socially and economically disadvantaged individuals not limited to those who qualify for the Section 8(a) program).  Therefore,

the government-wide goal contemplates that only a portion of the five percent goal will be met through the 8(a) program.

Second, the statute requires each federal agency to establish goals for the same groups. *Id.* § 644(g)(2). Accordingly, DoD established a five percent aspirational goal for socially and economically disadvantaged businesses, which includes but is not limited to Section 8(a) firms. *See* Pl.'s MSJ at 8-9.[20]   Third, beginning in 2002, DoD established a separate Section 8(a) goal, of approximately two percent of the value of prime and subcontract awards. *See* Pl.'s MSJ, Ex. B33, Deposition of Timothy J. Foreman at 29-30 ("Foreman Dep."); *see also* Pl.'s MSJ at 70 (stating that, in 2003, the DoD goal for 8(a) contracts rose to 2.1 percent).   DoD's Section 8(a) goal is a subset of the goal for socially and economically disadvantaged businesses. *See* Pl.'s MSJ at 9-10; *see also, e.g.*, 15 U.S.C. §§ 637(d)(1), (d)(3)(c).   Accordingly, the Court examines three goals, all of which are purely aspirational and all of which provide for less than five percent of contracts to be awarded under the Section 8(a) program.

---

[20]   DoD's five percent goal was contained in the DoD Program, 10 U.S.C. § 2323, which the Federal Circuit invalidated in 2008. *Rothe VII*, 545 F.3d 1023.   However, DoD's goal also originates in 15 U.S.C. § 644(g)(2), which remains in effect.   Neither party has asserted that DoD's goals have changed as a result of the Federal Circuit's decision in *Rothe.*

In light of the government's evidence discussed at length in
Section III.C. above, the Court concludes that these goals are
facially constitutional.  The evidence presented established that
minority firms are ready, willing, and able to perform work equal
to two to five percent of government contracts in industries
including but not limited to construction.  The evidence further
demonstrated that the effects of past discrimination have
excluded minorities from forming and growing businesses, and the
number of available minority contractors reflects that
discrimination.  Accordingly, "the *existing* percentage of
[eligible] minority-owned businesses is not necessarily an
absolute cap on the percentage that a remedial program" and in
particular, an aspirational goal, "might legitimately seek to
achieve."  *Adarand VII*, 228 F.3d at 1181.  "It is reasonable to
conclude that allocating more than 95 percent of all federal
contracts to non-minority persons, is in and of itself a form of
passive participation in discrimination that Congress is entitled
to seek to avoid."  *Id.* (quoting *Croson*, 488 U.S. at 492).

Plaintiff notes that Defendants do not maintain separate
statistics for the simulation and training industry, nor do they
have any disparity study for this industry.  Pl.'s MSJ at 53-54.
The Court agrees that these facts may be relevant in an as-
applied challenge; however, the Court does not reach the issue
because DynaLantic has already prevailed, on the threshold

question of compelling interest, in its as-applied challenge.
*See Rothe VII*, 545 F.3d at 1049-50 (finding that without a strong
basis in evidence, it was "impossible to evaluate" the numerical
proportionality factor because the government had nothing to
compare it to – it did not know the "share of contracts
minorities would receive in the absence of discrimination").  To
survive a facial challenge, however, the government need not
provide evidence that the goals are numerically proportionate in
each and every industry.

### 6. Burden on Third Parties

As Plaintiff points out, by their nature "[s]et-asides
impose a burden upon those not necessarily guilty of
discrimination."  Pl.'s Opp'n at 71.  The Supreme Court in
*Wygant*, however, held that "[a]s part of this Nation's dedication
to eradicating racial discrimination, innocent persons may be
called upon to bear some of the burden of the remedy.  'When
effectuating a limited and properly tailored remedy to cure the
effects of prior discrimination, such a "sharing of the burden"
by innocent parties is not impermissible.'"  *Wygant*, 476 U.S. at
280-81 (plurality opinion) (quoting *Fullilove*, 448 U.S. at 484);
*see also W. States*, 407 F.3d at 995 ("[A]lthough [race-conscious
measures] place[] a very real burden on non-DBE firms, this fact
along does not invalidate [the statute].  If it did, all
affirmative action programs would be unconstitutional because of

118

the burden upon non-minorities." (citing *Adarand III*, 515 U.S. at 237)).  Accordingly, remedial race-conscious harms must "work the least harm possible to other innocent persons competing for the benefit." *Grutter*, 539 U.S. at 341 (internal quotation omitted). "The proper focus is on whether the burden on third parties is 'too intrusive' or 'unacceptable.'" *Concrete Works IV*, 321 F.3d 973 (citing *Wygant*, 476 U.S. at 283).

The parties focus most of their arguments regarding undue burden on Plaintiff's as-applied challenge, *i.e.*, DoD's use of the 8(a) program in the military simulation and training industry and the alleged undue burden on DynaLantic as a result.  *See* Pl.'s MSJ at 61-66, 72-73; Defs.' Opp'n at 40-44; Pl.'s Opp'n to Defs.' MSJ at 71-77.  As explained throughout, the Court need not reach, and indeed is unable to reach, DynaLantic's as-applied challenge on narrow tailoring grounds.  *See Rothe VII*, 545 F.3d at 1049-50 (noting that the absence of a strong basis in evidence renders it impossible to consider certain of the narrow tailoring factors; without an understanding of the scope of discrimination at issue, a reviewing court cannot determine whether remedial measures are narrowly tailored to that discrimination). Accordingly, the Court limits its consideration of undue burden to Plaintiff's facial challenge.  While it is undoubtedly true that third parties bear the burden of the remedy in Section 8(a), as with any remedial scheme, the Court concludes that the use of

119

the Section 8(a) program to set aside certain contracts does not, on its face, create an impermissible burden on non-participating firms.

The Section 8(a) program includes a number of provisions designed to minimize the burden on non-minority firms.  As discussed above, the presumption that a minority applicant is socially disadvantaged may be rebutted if SBA is presented with credible evidence to the contrary.  13 C.F.R. § 124.103(c).  An individual who is not presumptively disadvantaged may qualify for such status if s/he can demonstrate social disadvantage by a preponderance of the evidence.[21]  *Id.*  And the 8(a) program requires an individualized determination of economic disadvantage, and is not open to individuals whose net worth exceeds $250,000 regardless of race.  *Id.* §§ 124.104(a),

---

[21]  Since Section 8(a)'s inception, the burden on non-minorities to show that they are socially disadvantaged has been reduced from a "clear and convincing" standard to a "preponderance of the evidence" standard.  *Compare* 13 C.F.R. § 124.103(c)(1) (current version), *with* 13 C.F.R. § 124.105(c)(1) (1997 version); *see also* 63 Fed. Reg. 35726, 35727-28 (June 30, 1998).  This change was expressly adopted to more narrowly tailor the Section 8(a) program, and has had the effect of making the program's benefits more widely available.  As of September 3, 1999, there were approximately 5,830 firms participating in the Section 8(a) program, of which about 105 (approximately 1.8 percent) were owned and controlled by individuals who had proven individual social disadvantage.  *See* Defs.' MSJ at 60 (citing Resp. to Pl.'s Second Set of Interrogs. to Defs., No. 4 (Nov. 4, 1999)).  By February 20, 2003, however, the percentage of program participants owned and controlled by individuals who had proven individual social disadvantage had risen to approximately 7.18 percent.  *See* Defs.' MSJ at 60 (citing Am. Resp. to Pl.'s Second Set of Interrogs. to Defs. (Apr. 17, 2003)).

124.104(b), 124.104(c)(2).  Other courts considering similar provisions in race-conscious statutes have found that they "minimize the race-based nature of the [] program," thereby also minimizing the adverse impact on third parties, and accordingly are narrowly tailored.  *Sherbrooke*, 345 F.3d at 972 (statute creates no undue burden where the presumption that minority applicants are socially disadvantaged is rebuttable, statute contains $750,000 net worth limitation on DBE status, thus excluding wealthy individuals of all races, and statute permits firms owned by non-minorities to qualify for DBE program if they can demonstrate social and economic disadvantage); *see also W. States*, 407 F.3d at 995 (same); *N. Contractors*, 2004 U.S. Dist. LEXIS 3226, at *133 (same).

In addition to the applicant-based criteria designed to minimize the burden on non-whites who seek to join the program, Section 8(a) regulations also contain provisions to mitigate the adverse impact on firms remaining outside the program.  The regulations prohibit the SBA from accepting a procurement for award as an 8(a) contract if it makes a determination that the award would have an adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs.  This adverse-impact concept is designed to protect small businesses which are performing non-Section 8(a) contracts, and this feature

121

helps narrowly tailor the program.  *See* 13 C.F.R. § 124.504.

Plaintiff argues that the impact analysis regulation does not

offer sufficient protection to non-participants.  Pl.'s Opp'n at

71-72.  However, the government is not required to eliminate the

burden on non-minorities in order to survive strict scrutiny; a

limited and properly tailored remedy to cure the effects of prior

discrimination is permissible even when it burdens third parties.

*See Wygant*, 476 U.S. at 280-81 (plurality opinion).  The Court

finds that the Section 8(a) program takes appropriate steps to

minimize the burden on third parties, and accordingly finds that

the Section 8(a) program is narrowly tailored on its face.

**F.   Civil Rights Claims**

**1.   Section 1981**

Plaintiff argues that the Defendants' actions violate not

only its constitutional rights, but also its rights under 42

U.S.C. § 1981.  Section 1981 gives all citizens of the United

States "the same right in every State and Territory to make and

enforce contracts . . . as is enjoyed by white citizens."  42

U.S.C. § 1981.  Section 1981(c), which was added to Section  1981

by the Civil Rights Act of 1991, further provides that "[t]he

rights protected by this section are protected against impairment

by nongovernmental discrimination and impairment under color of

State law."  *Id.* § 1981(c).  Defendants, federal agencies, are

operating under the color of federal law.  Section 1981 does not

apply to actions taken under the color of federal law, nor does it permit suit against instrumentalities of the federal government.  *See, e.g.*, *Sindram v. Fox*, 374 Fed. App'x 302, 304 (3d Cir. 2010); *Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005); *Davis-Warren Auctioneers v. FDIC*, 215 F.3d 1159, 1161 (10th Cir. 2000); *Davis v. Dep't of Justice*, 204 F.3d 723, 725 (7th Cir. 2000); *Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1998); *Prince v. Rice*, 453 F. Supp. 2d 14, 25-26 (D.D.C. 2006). Accordingly, Plaintiff's Section 1981 claim must be dismissed.

### 2.    Section 2000d

Plaintiff has asserted a claim against Defendants pursuant to 42 U.S.C. § 2000d, *et seq*. (Title VI of the Civil Rights Act of 1964) for declaratory and injunctive relief.  Title VI's operative section provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  The statute defines "program or activity" as the operations of departments, agencies, instrumentalities, and other sectors of state or local governments; colleges and certain public systems of education; local educational agencies and school systems; certain corporations and other private organizations; and other entities established by a combination of two or more of the

mentioned entities.  42 U.S.C. § 2000d-4a.  As a former Judge on this Court has noted, "this comprehensive definition does not include the operations of the federal government and its agencies, and, indeed, the caselaw recognizes that a Plaintiff may not bring suit under Title VI for programs maintained directly by federal agencies." *Wise v. Glickman*, 257 F. Supp. 2d 123, 132 (D.D.C. 2003) (collecting cases).

In response, Plaintiff cites *Fordice Construction Company v. Marsh*, a 1990 decision from the Southern District of Mississippi which held, without analysis or citation to authority, that the SBA's use of the Section 8(a) program violated Plaintiff's rights under Section 2000d.  773 F. Supp. 867, 882 (S.D. Miss. 1990).  As far as the Court is aware, no case has followed *Fordice* for this proposition.  In light of the weight of contrary authority, including case law from this court, the Court finds *Fordice* unpersuasive.  *See Soberal-Perez v. Heckler*, 717 F.2d 36, 38 (2d Cir. 1983); *Wise*, 257 F. Supp. 2d 123; *Marsaw v. Trailblazer Health Enters., LLC*, 192 F. Supp. 2d 737, 750 (S.D. Tex. 2002); *Williams v. Glickman*, 936 F. Supp. 1, 5 (D.D.C. 1996).  Because Plaintiff may not bring suit under Title VI for programs administered directly by the federal government, its claim under Title VI must be dismissed.

**G.    Relief**

For the reasons set forth above, the Court finds Section 8(a) is constitutional on its face.  Accordingly, Plaintiff's requests for relief regarding its facial challenge are denied. Plaintiff has, however, prevailed on its challenge to Section 8(a) as applied to the military simulation and training industry. Plaintiff requests a permanent injunction prohibiting Defendants "from awarding contracts for military simulators based on the race of the contractors (including, but not limited to, pursuant to the set-aside scheme)."  Second Am. Compl. at 8.  Because the only set-aside program before the Court is that contained in the Section 8(a) program, the Court is not empowered to grant relief beyond that program, and accordingly considers the request for a permanent injunction solely as it relates to Section 8(a).

For the reasons set forth above, the Court finds that DynaLantic succeeds on the merits of its as-applied constitutional challenge to the Section 8(a) program, specifically, SBA and DoD's award of contracts for military simulators under the Section 8(a) program.  The second prong of the permanent injunction test requires a finding that Plaintiff will suffer irreparable injury in the absence of injunctive relief.  "It has long been established that the loss of constitutional freedoms . . . unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304,

1312 (D.C. Cir. 2009) (citation omitted); *see also Simms v. Dist. of Columbia*, Case No. 12-cv-701, 2012 U.S. Dist. LEXIS 93052, at *41-42 (D.D.C. July 6, 2012).  Because DynaLantic succeeds on the merits of its as-applied constitutional equal protection claim, the Court finds this deprivation of Plaintiff's constitutional rights constitutes irreparable harm.  Turning to the third prong, the balance of harms, the Court finds the balance tips in favor of Plaintiff, as Defendants may continue to award contracts for military simulators under all other federal programs.  Moreover, nothing prevents the government from invoking Section 8(a), provided it complies with the equal protection requirements. Finally, the Court considers the fourth factor, public interest. As this Circuit held in *O'Donnell*, the issuance of an injunction "would serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications."  963 F.2d at 429.  "Without question, the public has an interest in ensuring that Defendants do not implement a set-aside plan in violation of the Constitution."  *Cortez III*, 950 F. Supp. at 363.

Plaintiff also requests that the Court issue a declaratory judgment that the Section 8(a) program as applied by Defendants to set aside contracts for military simulators is unconstitutional and violates DynaLantic's rights to equal protection.  In light of the Court's issuance of a permanent injunction in DynaLantic's favor on the identical issue, the

Court concludes that the requested declaratory relief is "both duplicative and unwarranted" and therefore will deny Plaintiff's request for a declaratory judgment. *Serv. Employees Int'l Indus. Pension Fund v. Aliquippa Cmty. Hosp.*, 628 F. Supp. 2d 166, 172 n.2 (D.D.C. 2009); *see also Gibson v. Liberty Mut. Group, Inc.*, 778 F. Supp. 2d 75, 79 (D.D.C. 2011) (dismissing claim for declaratory relief because it would neither clarify the rights of the parties nor terminate the dispute between them).

**IV.  CONCLUSION**

For the foregoing reasons, the Court concludes that the Section 8(a) program, 15 U.S.C. § 637(a)(1), is constitutional on its face.  However, based on the record before it, the Court is unable to conclude that Defendants have produced evidence of discrimination in the military simulation and training industry sufficient to demonstrate a compelling interest.  Therefore, DynaLantic prevails on its as-applied challenge.

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  The Small Business Administration and the Department of Defense are hereby enjoined from awarding procurements for military simulators under the Section 8(a) program without first articulating a strong basis in evidence for doing so. Plaintiff's remaining requests for declaratory and injunctive

127

relief are **DENIED**.   A separate Order accompanies this Memorandum

Opinion.

**Signed:**      **Emmet G. Sullivan**
                **United States District Judge**
                **August 15, 2012**